McCOMB v. CONSOLIDATED FISHERIES CO.

Civ. No. 859.

District Court, D. Delaware.

Jan. 30, 1948.

William S. Tyson, Sol. of Labor, Jeter S. Ray, Associate Sol. of Labor, and John J. Babe, Asst. Sol. of Labor, U. S. Dept. of Labor, all of Washington, D. C., Ernest N. Votaw, Regional Atty., and Morris Hoffman, Associate Atty., U. S. Dept. of Labor, both of Philadelphia, Pa., W. Thomas Knowles, Asst. U. S. Atty., of Wilmington, Del., for plaintiff.

Tunnell & Tunnell of Georgetown, Del., for defendant.

H. Thomas Austern and Howard P. Castle, both of Washington, D. C., amici curiae.

Herald A. O'Neill and Allen, Hilen, Froude & De Garmo, all of Seattle, Wash., of counsel, for amici curiae Alaska Salmon Industry, Inc.

Eugene D. Bennett and Pillsbury, Madison & Sutro, all of San Francisco, Cal., of counsel, for amici curiae California Fish Canners Ass'n, Inc.

Robert Littler and Littler, Coakley & Lauritzen, all of San Francisco, Cal., of counsel, for amici curiae Monterey Fish Processors Ass'n.

RODNEY, District Judge.

This is an action brought by the Administrator of the Wage and Hour Division of the United States Department of Labor against Consolidated Fisheries Company, a corporation organized under the laws of the State of Delaware. The case involves the application of the Fair Labor Standards Act[1] to certain employees such as a cook, watchman, maintenance men and certain office employees of a corporation

---

[1] 29 U.S.C.A. § 201 et seq.

engaged in the preparation of several by-products directly from menhaden, a valuable but non-edible fish.

The case has potentialities far beyond its own visible limits. Even viewed as an isolated employment, its principles might, nevertheless, have effect upon vast industries involving the colossal salmon, tuna, mackerel and sardine industries totaling over a billion pounds of product. For this reason representatives of those industries have appeared in this case as amici curiae and filed briefs herein. On the other hand the view of the Act must not be so general as to lose the true relation of the appropriate law to the facts here present and on which this case must be decided.

Insofar as applicable to this case the Fair Labor Standards Act provides by Section 6 that the defendant should pay "to each of his employees who is engaged in commerce or in the production of goods for commerce" not less than forty cents an hour. Section 7 provides that employees of the character just mentioned shall not be employed for a workweek longer than forty hours without the payment of other specified compensation. The Act also provides that proper records of the employment shall be kept.

No difficulties arise from a construction of Sections 6 or 7. It is conceded that all of the employees of the defendant here involved are normally "engaged in commerce or in the production of goods for commerce" and no distinction between the two phrases is here material.

The difficulties of this case arise from the exempting section of the Act and the application of the facts to the language and spirit of the exempting clause.

' The relevant exempting clause is as follows: "The provisions of sections 206 and 207 of this title shall not apply with respect to * * * any employee employed in the catching, taking, harvesting, cultivating, or farming of any kind of fish * * * including the going to and returning from work and including employment in the loading, unloading, or packing of such products for shipment or in propagating, processing, marketing, freezing, canning, curing, storing, or distributing the above products or byproducts thereof * * *". 52 Stat. 1067, 29 U.S.C.A. § 213(a) (5).

Before adverting to the facts of the case a brief word as to the construction of the coverage of the Act and of the exemptions may not be out of place. The Act is highly remedial and calls for a liberal construction so as to embrace every employer or employee coming reasonably within its scope. As the coverage of the Act is liberal, so the exemptions must be strictly construed in order to ensure the liberality of coverage. We are not here entirely concerned with the claimed personal exemption of an employee or of any judicial construction of such personal exemption, but rather must consider the scope of the occupational exemption provided by Congress itself. We must attempt to determine what Congress meant by exempting from the terms of the Act every employee employed in the "loading, unloading, or packing of such products [fish] for shipment or in * * * processing, marketing, * * * curing, storing, or distributing the above products or byproducts thereof." The occupational exemption would seem to be very liberal in scope and whether any individual employee comes within the occupational exemption must depend upon the facts. While separate findings of fact will be filed, yet some statement of such facts is essential to a proper understanding of the result reached by this court.

The following facts appear from the evidence as epitomized in the brief of the plaintiff.

The defendant is a Delaware corporation having a plant at Lewes, Sussex County, Delaware, consisting of a wharf or dock, manufacturing plant, storage houses, storage tanks, railroad sidings, bunk houses, and mess hall and kitchen therefor. From late May or early June until October or November in each year, fish are brought to the dock by defendant's boats or those of other fishermen from whom it buys the fish. The fish are menhaden, which is a type of fish not used for human consumption but rich in oil. At the wharf or dock the fish are unloaded from the boats and

conveyed by a sluice or water conveyor to the factory where the water is drained off and the fish are cooked and pressed to extract the oil and water in the fish. The oil and water is run through a series of tanks by which processes pieces of fish drop to the bottom, but the oil rises to the top and is finally drained off into tanks for cooking and then storage. The oil is of two grades, Grade A and gurry oil, depending on the condition of the fish at the time of processing. The sediment which remains, particularly from the gurry oil, is made into what is called "gurry cake." The solid portion of the fish coming from the presses after the extraction of the liquids is run through dryers and converted to dried scrap and some of this is ground in hammer mills into fish meal. The fish meal is principally used for poultry and cattle food but also to some extent for fertilizer. Sometimes too much oil remains in the scrap to make dried scrap or fish meal. This is treated with sulphuric acid to drive out some of the free water remaining after the pressing and to prevent the increase of maggots. The resulting product is called acidulated fish scrap and is sold for fertilizing purposes.

If the fish can be processed within ten or twelve hours after they are caught, the oil extracted will be mostly Grade A oil and the fish scrap will be in good condition. After that period of time, the fish deteriorate rapidly and, as a result, it is impossible to extract all the oil from them. The remaining scrap in such cases tends to gum up and harden and is not very suitable even for fertilizer. The oil, once it has been extracted, is a fairly stable product. The fish scrap, however, must be very carefully cooled and stored or it will heat up and, if not caught in time, spontaneous combustion will result. The plant has storage capacity for about 15,000 tons of fish scrap or meal and about 75 carloads of oil. Because of the unstable nature of the fish cake and meal, it is not stored on the premises any longer than necessary to find a market for it. There have been times when both scrap and oil were held over until the following fishing season, but at times it has been possible to find a market by the end of the year or early in the following calendar year.

The plant is situated about two miles from the nearest town and the nearest restaurant. A large number of the manufacturing employees come from distant places. The company therefore provides bunk houses and a mess hall for the employees. It would not be possible for them to go outside to eat, both because of the distance and because their continuous proximity to the fish during working hours would make their presence in a public eating house undesirable. The company employs a cook and other help to furnish the employees with meals.

After the close of the fishing season in October or November, most of the manufacturing employees go back to their homes in more southern regions. The few that remain clean out the conveyors, the presses and the filters, sediment tanks and other machinery of the pieces of fish which accumulate during the fishing season, as well as fish which fall out of the conveyors onto the ground during the fishing season. These fish particles so retrieved from the machinery are also processed into a low grade form of fish scrap. As much of it as possible is sold but some portion of it may be used merely for fill in surrounding parts of the premises. Approximately two hundred tons of marketable acidulated fish scrap are normally retrieved in this cleaning process. Because of the small number of laborers who remain for this work, it takes almost the whole time between fishing seasons, from November to May, to complete the work of cleaning out the machinery from the last season's accumulation and getting it ready for the new season.

The non-fishing season also is utilized to drive new piling for the wharves and to make other and more permanent repairs to the buildings and machinery than it is possible to make without interrupting the processing of fish for too long a time during the fishing season.

Substantially all of the products produced at the defendant's plant are shipped in interstate commerce and all of the defendant's employees are engaged in the production of these goods which are shipped in interstate commerce or in some pro-

cess or occupation necessary to such production.

It may also be stated that in the proper construction of the Fair Labor Standards Act due consideration must and should be given to an interpretation of the Act made by the Administrator of the Wage and Hour Division. The weight and extent of this consideration is clearly stated in Skidmore v. Swift and Company, 1944, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 as follows: "We consider that the rulings, interpretations and opinions of the administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." ·

The defendant, it seems, in the conduct of its business gives employment to some 400 employees. The government contends that all those employees are engaged "in the production of goods for commerce" and so come within the normal application of the Act. The defendant concedes that all its employees are so employed. The government contends that, while all the employees are engaged in the production of goods for commerce, yet the nature of the employment of certain employees is such as not to bring them within the pertinent exempting clause of the Act. The defendant contends that its sole occupation is the catching and processing of fish into by-products and the packing, storing, loading and distributing of such products in interstate commerce; that the activity of its employees which make them engaged in production for interstate commerce is precisely the same activity in connection with the catching of fish and processing of such into by-products and the distribution of such products in interstate commerce; and that the employees, being within the Act, must clearly come within the specific exemption.

The government contends that the law has been violated by the defendant only with reference to some ten employees out of a total of some 400 employees; at least the activities of ten employees only were covered by the evidence. The activities may be divided into four general groups: (1) watchman, (2) cook, (3) certain office employees, and (4) odd-job or maintenance men, and these will be considered in their order.

Before considering the activities of the individual employees a word may be material as to the period of employment. Fish seem actually to have been caught from May to November of each year. The preliminary processing is done as soon as possible after the fish are caught. During the period from November to May the lower grade by-products are salvaged and processed, the entire output of the factory is attempted to be marketed, and the plant put in condition for operation when the fish are caught by making repairs which were not possible when the fish were running without disastrous stoppages and delays. To some extent the activities of the listed employees belong to each period and, so far as material, will be separately considered.

(1) Marion Plotkowski is employed as a night watchman during the entire year and has been so employed upwards of five years. During the fishing season he has duties in connection with the new and itinerant labor coming to the plant with relation to sleeping accommodations. His general duties include the watching for fire, and the nightly rounds cover some nine key stations to ensure his active supervision. The product of the defendant includes fish scrap which is strongly subject to spontaneous combustion, and his duty is to feel for the presence of heat, to dig into the scrap with a pitchfork and to spread the scrap so as to allow it to remain cool. His duties include the supervision of tank cars containing fish oil for leaks or fire therein.

The Administrator of the Wage and Hour Division, by Interpretative Bulletin No. 12 in November, 1940, generally held that a watchman employed by a seafood and fishing industry, without discussion

of his specific duties, would not be exempt from the operation of the Act. By Release No. 1609 dated October 14, 1941, the same general holding is made. By Release No. A-15 of March 29, 1945 a succeeding Administrator revised and to some extent superseded the former rulings. This latter Release recognized that the exemption of part of the present section was intended not to be narrower than the broad exemption provided for employees in agriculture and, in substance, held that insofar as the exemption now considered is concerned any employee whose occupation is functionally connected and necessary to the changing of the fish into its by-products is to be considered as exempt. So the Release considered a fireman exclusively providing steam for processing kettles was exempt, but a night watchman was not.

In Waller v. Humphreys, 5 Cir., 1943, 133 F.2d 193, the Circuit Court of Appeals considered a set of facts strongly analogous to the present case. There the court considered the status under the present Act, of watchmen in a seafood and processing plant of the shrimp and oyster industry. The court held that since the entire business of the plant was the production of goods for commerce, watchmen employed to prevent miscarriages and interruptions in the processing of products were employed in a necessary part and ordinarily would be within the Act. The court held that during the processing operation watchmen came within the exemption now considered, and that if there were any workweeks when no processing was done and the occupation was solely watching, then the employees as to such time did not come within the Act at all as not being employed in producing any goods for commerce.

Whether there is any "off season" at all in the present case, especially as to certain employees, will be herein later considered.

To me it would seem that where a by-product produced by a company was, during its preparation, peculiarly liable to combustion, and an employee is specially charged with the duty of spreading and cooling such product in order to prevent such combustion, then such employee must be employed either in the "processing," "marketing," "storing" or "distributing" of such product, and so within the terms of the exemption. If his occupation is entirely disconnected with such processing, marketing, storing or distributing, or unnecessary thereto, then I cannot understand how that same service or employment would make him a necessary part of the production of those same goods in interstate commerce.

■ The facts of the present case with relation to the watchman make ours a much stronger case than Waller v. Humphreys, supra, but in line with the reasoning of that case I think the watchman in the present case exempt from the provisions of the Act.

■ (2) Cook. The facts covering one Maull, the cook, are quite meagre and are confined to his activities during a portion of the year 1944 while the fish were being caught. It is in evidence that the plant of the defendant was about two miles from the nearest restaurant; that it would not be possible for the men to go outside to eat, both because of the distance from the work and because their work with the fish makes their presence so objectionable that their use of a public restaurant would be undesirable and impossible. It is in evidence that the fishing fleet of the defendant seeks the fish from Montauk on the North to the Virginia Capes on the South. While the record is silent as to any cook on these boats, I assume the presence of such to be a fact. The question of exemption of the cook on the boats engaged in the catching of fish is not included in the present case, but I see no distinction between the two. If the services of a cook is a necessary factor in the catching of the fish, it would seem that such services, under the present circumstances, is a necessary factor connected with the processing of such fish. The case of Consolidated Timber Co. v. Womack, 9 Cir., 1942, 132 F.2d 101, has no bearing on this case. In the cited case the facts surrounding the employment of the cook were entirely dissimilar and the language of the exempting statute was entirely distinct and different.

804

(3) Office employees. The only employee falling into this category whose activities are covered by the evidence was Rollin C. Cannon. He was employed from August, 1944 to February, 1945 covering both the active fishing season and after it had ceased. The activities of this employee are designated as general office work. He kept payrolls and the time of prisoners of war who were then employed; he posted sales books and ledgers; he kept account of the sales of commodities, fish meal, scrap and oil; he ascertained the amount of bills and sent them to customers of truck loads or car-load lots and made shipments of the merchandise sold by defendant. If these be not activities within the scope of the marketing of products and so within the exemption then it is difficult to see what could be covered by such terms.

(4) Odd job men. The activities of some seven men fall within this category and these activities differ slightly in character but contain much in common. Some of these men worked for short periods of several months' duration, both during the active fishing season and during the more inactive period of repairs and replacements. At least three of these employees have worked continuously for several years' extent.

Baynum, employed from October, 1943 to July, 1944 drove the truck that hauled the fish scrap marketed by the defendant. When the scrap was not being delivered he did repair work and assisted in replacing piling.

Pepper, employed from February, 1944 through March, 1945, worked during the fishing season in the fish scrap shed bagging and loading scrap on cars. When not so employed he worked on the seine house and made forms for concrete foundations for replacements.

Parsons, employed from September to November, 1942 and Horner, employed from October, 1943 to July, 1944 did general repair work upon the plant and buildings in order that the plant would be in a condition to operate.

King, Lawson and Mitchell have worked continuously over a period of several years.

They operated the truck to get materials to make repairs, drove pilings, remodeled the drying house, installed machinery and generally restored the condition of the plant.

Attention must be drawn to the nature of the business of the defendant. It is clearly established that the fish must be processed within a few hours after being caught. After that period they quickly deteriorate and the superior grade oil is lost and the scrap, itself, is very inferior in character. Stoppages and interruptions during the fishing season are therefore destructive of the operation of the plant and repairs must be made when the fish are not being actively processed. After the actual processing of fish in each year is over, most of the itinerant manufactory employees leave the vicinity. Because of the small number of laborers who remain it takes the entire time between fishing seasons, from November to April or May, to complete the cleaning of the machinery and getting it ready for the new season and to make the repairs that will ensure a successful and continuous operation.

There is, in effect, no off-season in the industry. The reclaiming of the fish scrap remaining in the machines after the processing is finished is an integral and important part of the business. This acidulated fish scrap amounts to several hundred tons and as much as possible is sold long after the actual processing operation has finished. The actual marketing of most of the products of the company is done after the processing of the fish has ceased. At times it has been necessary to hold the oil and scrap until the following fishing season but market conditions have often made it possible to dispose of the products by January or February.

The cleaning of the machines and the necessary repairs to the plant, being impossible while the processing of fish is being done, are essential portions of the operations. The mere number of men employed and the time consumed by them are not material elements. If this work is material if done by thirty men in a month's time, it does not lose that character if done by a lesser number of men over a five-month period when the fish are not being caught.

██ It would seem to me that the activities of the designated employees are an integral part in the processing and marketing of the fish or by-products thereof; that if any portion of the activities for any given length of time could be considered as entirely separate and apart from the catching, processing or marketing of such products, then such activities could not be considered in the production of those same products as merchandise for commerce.

It now becomes material to see whether the views herein expressed are at variance with any former consideration of the same question by another court.

The exemption here material[2] has been somewhat considered in several cases.[3] Of the cited cases only two need be considered.

In Fleming v. Hawkeye Pearl Button Co., 8 Cir., 1940, 113 F.2d 52, the court considered the application of the pertinent exemption to the pearl button industry where the buttons were made from shells from inedible clams. It clearly appears that the defendant bought the clam shells from others and simply manufactured or caused to be manufactured these shells into buttons and shell novelties. No employee of the company had any connection with the catching of the clams and there was no sequence or chain of activities leading from the catch to the manufacture. The court said the sole question was whether the employees engaged in the manufacture of the buttons came within the pertinent exemption. The court held the employees not exempt because the shells were stored for later use and the button making did not involve the processing of any perishable product. There seems ample warrant for the conclusion of the court. The court divided the fishing industry into two portions—the "off shore" and "on shore" activities and viewed the shore activities as exempt only when related to the trip operations. Whether all the observations of the court were actually necessary to the court's conclusions may be somewhat doubtful, but no portion of the case seems antagonistic to the conclusions herein reached. In the cited case the "processing" as applied to the fishing industry was expressly said to include "extracting oil from, manufacturing meal or fertilizer from, products of the industry; or otherwise manipulating products of the industry." Page 57.

Waller v. Humphreys, 5 Cir., 1943, 133 F.2d 193, has been heretofore briefly considered in connection with the facts as applied to the watchman. Not only is this case the more nearly analogous to the case at bar but in chronological order it represents the latest authoritative statement of the extent of the pertinent exemption.

No case, it seems, has construed the present exemption at variance with the conclusion herein reached.

Both parties have pressed upon the court the consideration of the legislative history by which the statutory exemption came into being. That the legislative history of the Act may be considered in ascertaining its meaning is widely recognized.[4] The legislative history of the Fair Labor Standards Act, and particularly the exemption herein material, is not entirely clear as to the extent of its application to the fishing industry and can only be considered with some undesirable prolixity.

When the Act was first considered it was early understood that certain exemptions were necessary and especially as to certain seasonal employments. In the original Senate bill there was a complete exemption from both the wage and hour provisions for "any person employed in the taking of fish, seafood or sponges." There was also included in the Senate bill an

---

[2] 29 U.S.C.A. § 213(a) (5).

[3] Fleming v. Hawkeye Pearl Button Co., 8 Cir., 1940, 113 F.2d 52; Walling v. W. D. Haden Co., 5 Cir., 1946, 153 F.2d 196; Walling v. Georgia Peat Moss Co.,* Inc., C.A., 93. D.C.M.D.Ga.1943; Dize v. Maddrix, 4 Cir., 1944, 144 F.2d 584, affirmed 1945, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296; Johnson v. Johnson & Co., D.C.Ga.1942, 47 F. Supp. 650; Waller v. Humphreys, 5 Cir., 1943, 133 F.2d 193.

[4] E. g., Walling v. Portland Terminal Co., 330 U.S. 148, 151, 67 S.Ct. 639; Walling v. Keansburg Steamboat Co., 3 Cir., 1947, 162 F.2d 405, 407; Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 706, 65 S.Ct. 895, 89 L.Ed. 1296.

* No opinion for publication.

exemption from the "hours'" provision "for any person employed in connection with the * * * canning or other packing or packaging of fish, seafoods, sponges * * * when the services of such person are of a seasonal nature."

The House bill provided that "in case of an employer engaged in the first processing of or in canning fresh fish or fresh seafood, the provision of sub-section A [Maximum Hours' Provision] shall not apply for twelve workweeks in any calendar year to his employees in any place of employment where he is so engaged."

The House bill also contained a provision which is exactly similar, except for two commas, to Section 13(a) (5) as now considered, and provided that neither the wage nor hour stipulation should apply to any employee coming within such provision.

The two bills went before the Conference Committee. The agreement reached by such Committee resulted in the exemption as it now exists. As heretofore stated this provision (except for two commas) appeared in the House bill. The "hours'" exemption for canning or packing of fish as set out in the Senate bill was eliminated. This provision was more limited in the sense of only applying to persons employed in connection with the "canning or other packing or packaging of fish," etc., but it did cover those employees employed in "connection" with such activity and to that extent its exemption was a broad one. The other exemption as appearing in the Senate bill, and omitted as a result of the Conference, related solely to the "taking" of fish, etc.

The limited House version providing for the twelve-week exemption from the "hours'" provision for employees of employers engaged in the first processing or canning of fish was also eliminated, and the exemption emerged from the Conference Committee as it now exists. The last quoted House provision, while limited as to the time element, was a very broad exemption in the scope of activity of the employee, and seemed to cover any employee employed by an employer engaged in the first processing or canning of fresh fish or seafood.

There is no indication that the exemption as finally agreed to was intended to be narrower in extent than that which had already been reached by either House of Congress. The difficulty seemed to be to select language which embodied the principles of the exemptions adopted by both Houses. Some light may be thrown upon the meaning of the exemption as finally adopted by considering the happenings when this same language was placed by amendment in the House bill by Congressman Bland. In originally advocating the amendment which was finally adopted as the present exemption, Congressman Bland stated, "I am only asking for the seafood and fishery industry that which has been done for agriculture." The broad exemption for agriculture as provided by the Act would, if applied to the fishing industry, compel the conclusion now reached by this court.

That the Wage and Hour Administrator appreciated the similarity of statutory exemption between those provisions applying to the fishing industry and those provisions applying to agriculture is shown by Interpretive Bulletin No. 12 of November, 1940 where it is stated, "The legislative history shows clearly that the exemption provided by Section 13(a) (5) was intended to do for the seafood and fishing industry that which was done in other sections of the Act for agriculture." In Release No. A-15 of March 29, 1945, a succeeding Administrator said, "Also, since the legislative history indicates that the first part of the exemption relating to the catching, taking, etc. of fish, etc. was intended to be not narrower than the exemption provided for employees employed in agriculture in 13(a) (6) of the Act, this part of the exemption is considered to extend to employees employed *in any practices performed as incident*[5] to fishing, fish farming or similar operations in the same sense that practices referred to in section 3(f) of the Act are performed as incident to or in connection with the farming operations described there."

---

[5] Emphasis that of the Administrator.

Just where or why it has been determined that the first portion of the exemption is precisely similar to the exemption provided for agriculture and the second portion of the exemption should be of an entirely different nature does not appear. The court in the Hawkeye case, supra, and counsel in the present case seize upon the phrase "including employment in the loading, unloading, etc." as connecting the shore operations with the trip operations, and making the exemption of shore operations solely dependent upon and necessarily and immediately following the trip or "off shore" operations. Of course, there must be some connection between the shore operations and the trip operations in the sense that the fish are only obtained by the trip operations and the shore operations are dependent upon the existence of those fish. I think, however, that the statute has been misread and the phrase to which such deference has been paid is taken from its proper position and considered with surroundings of which it is not a part. To me it seems that the statute clearly makes two exemptions. The first exemption covers the catching, etc. of the fish and the loading, unloading or packing of such fish for shipment. The exemption has to do with the fish as such and to their then state as fish. Thus, by deletion, we find that the statute exempts "any employee employed in the catching, taking, harvesting, cultivating, or farming of any kind of fish, shell fish, crustacea, sponges, seaweeds, or other acquatic forms of animal and vegetable life, including the going to and returning from work and including employment in the loading, unloading, or packing of such products for shipment."

The second exemption does not primarily concern the fish in their native state. It has to do with the fish as they are processed or undergo some treatment of a nature that can only be accomplished by the passing of some indeterminate period of time or in the development of by-products of the fish and in the marketing, storing or distributing of such products or by-products. Thus this second exemption, by deletion, would exempt "any employee employed * * * in propagating processing, marketing, freezing, canning, curing, storing, or distributing the above products or byproducts thereof." The phrase to which attention has been drawn belongs to the first exemption and not to the second with which I think it is not concerned.

It is difficult to see what activity in connection with the production of a byproduct of fish would not be embraced with the terms "processing, marketing, freezing, canning, curing, storing, or distributing the above products or byproducts thereof." If, then, these terms include every activity in connection with processing by-products of fish, and if the exemption as to fishing or fish farming includes all employees employed "in any practices performed as incident to fishing" and the same exemption applies to processing of fish, then it is difficult to see how the exemption could fail to cover employees employed "in any practices incident to processing, marketing, freezing, canning, curing, storing or distributing" of such by-products.

While the present case must in large measure be determined upon its own facts, yet in determining the meaning of Congress in adopting the relevant exemption, consideration must be given to the tremendous fishing industries of Alaska and the West Coast, and of whose magnitude and problems Congress could not have been ignorant. One exempting provision is applicable alike to the menhaden industry here involved and the gigantic salmon industry of Alaska yielding six hundred million pounds a year and constituting about 90% of our salmon production. The instructive brief of the amici curiae sets forth with clarity the nature and problems of the major part of the fishing industry covered by the exemption, and the facts there set forth must be assumed to be correct.

Bristol Bay, where much of the salmon industry is conducted, is over 2,000 miles from the nearest American point; salmon can only be caught in summer and, for natural and conservation reasons, the time of canning and processing is limited to three or four weeks between June 25 and July 25 and all salmon must be processed and canned from 24 to 48 hours after being caught and the canneries must be estab-

lished at the nearest available points. Every person connected with the salmon fishing and processing industry, including fishermen, cannery workers, machinists, carpenters, cooks, doctors and nurses and other employees, is required to be transported thousands of miles to the scene of operation and returned after the short season is over. In the time of activity each employee must work at many occupations beside the occupation which is normally his own. The industry is highly integrated and during the season no one classification would seem to be more essential than any other form of employment, for if one branch of activity fails, then all others must equally fail.

Assuming that Congress had some knowledge of the fishery industry as to which it was legislating, it would seem that the language of the exemption was carefully chosen to effectuate its intention. If the cooks, watchmen and maintenance men actually employed in connection with the salmon industry or other fishing industries of magnitude were intended to be exempt from the operation of the pertinent law, then those same activities in the present case and operating under the same exempting provisions would fall within the same category.

The large tuna fish industry of the West Coast, producing over two hundred million pounds, and the sardine industry, producing the largest volume of canned fish in America, have points of similarity to the salmon industry, but also material differences. In the tuna industry there is no certain period of cessation of active operations and the plants are continually in a state of emergency. All operations are interdependent one upon another and the maintenance men especially are important factors in the continued operation of the factories and the work of the fishing industry. Congress was interested in the ceaseless production of fish products and by-products and in their continuous flow to the consuming public.

After a full consideration of the exemption herein considered and in the light of its legislative history and of the facts of this case, I am of the opinion that the employees here considered were not subject to the provisions of the Act as to either the wage or hour provisions.

The present action, however, was not based exclusively upon the alleged violation of the provisions governing minimum wage or maximum hours; it alleged also a violation of the provisions requiring the keeping of certain stipulated office records. The pleadings and other portions of the record of the case before me do not clearly disclose the nature of such records as were kept. Clearly the employer was engaged in the production of goods in interstate commerce. The Act itself provided[6] that an employer subject to any provision of the Act should keep such records and make such reports as might be required by the Administrator. The Administrator, by an Administrative Regulation issued October 21, 1938,[7] required certain records to be kept as to each person employed with the exception, inter alia, of employees exempted by Section 13(a) (5). I have indicated my opinion that the designated employees came within the exemption provided by Section 13(a) (5). The foregoing Administrative Regulation seems to have been unchanged until August 13, 1941. Upon the latter date (and effective September 15, 1941) another Administrative Regulation was issued.[8] This Administrative Regulation required every employer to make and preserve records containing certain specified but limited information on "every employee covered by the Fair Labor Standards Act but to whom the employer is not compelled to pay at least the minimum hourly wages provided in Section 6 or an applicable wage order or to pay overtime excess compensation as provided in Section 7 due to the applicability of * * * Section 13(a) (5) * * *"

Whether these limited and specified records were or were not kept by this

---

[6] 29 U.S.C.A. § 211(c).

[7] 3 F.R. 2533; 29 C.F.R. (1938 Supp.) § 516.1, p. 1113.

[8] 6 F.R. 4694; 29 C.F.R. (1941 Supp.) § 516.12, p. 2567.

employer does not clearly appear in this case, and in this absence of proof no injunction as prayed for should be granted.

A decree may be prepared in accordance with this opinion.