## WAIALUA AGRICULTURAL CO., Ltd., v. CIRACO MANEJA et al.

### Civ. No. 787.

District Court, Hawaii.
April 8, 1948.

Rufus G. Poole, of Washington, D. C., and E. C. Moore, of Honolulu, T. H., for plaintiff.

Richard Gladstein, of San Francisco, Cal., and Myer C. Symonds, of Honolulu, T. H., for defendants.

METZGER, District Judge.

Arising from diverse view, such as to create an actual controversy, of the intent, meaning, and application of certain sections of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., the plaintiff, as a fairly representative plantation of the sugar industry in Hawaii, brought this action by agreement with collective bargaining representatives of certain of its employees, praying for a declaratory judgment to determine its rights under the Act as an employer, and the rights of the defendant-employees named, as well as all other of its employees engaged in work of a similar kind. The Court is satisfied, after examination, that it has jurisdiction to deal with this matter in a declaratory judgment, under Rule 23(a), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, and Section 24, as amended, and 274d of the Judicial Code, 28 U.S.C.A. §§ 41, 400. Tennessee Coal, Iron & Railroad Co. v. Muscoda Local No. 123, 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949, 152 A.L.R. 1014; Jewell Ridge Coal Corporation v. Local No. 6167, United Mine Workers of America, 325 U.S. 161, 65 S.Ct. 1063, 89 L.Ed. 1534.

The plaintiff is one of the larger corporations in Hawaii engaged in nearly all the activities necessary to the production of raw sugar and molasses and the marketing of these commodities in the United States. Its cane goes to its own sugar mill and practically all of its raw sugar goes to the California-Hawaiian Refinery at Crockett, California for further processing and sale as refined sugar.

In September, 1946 it employed in various work on its plantation property 1,144 persons; in years past the number of its employees was twice or more greater. During 1945 it produced 56,193 tons of raw sugar, being the third largest producer in Hawaii. Its farming and factory operations are carried on in the northwestern side of Oahu about 30 miles from Honolulu. It grows and harvests cane on about 9,660 acres of land owned and leased by it. The activities performed in the carrying on of its entire business are quite numerous and diverse. Among other things they include clearing and preparation of land, preparation and transportation of seed, planting, cultivating, irrigating, fertilizing, spraying weeds with herbicides and cane with insecticides, harvesting, road and railroad building and maintenance, surveying, water development, ditching and ditch and flume tending and upkeep, fencing, reservoir operation and maintenance, water pump operations and pipe line maintenance, machine installations, moving, and operations of various kinds, as passenger conveyances, trucks, tractors, locomotives, bulldozers, grappling and loading cranes and others. railroad operations for various carrying purposes, stores, warehousing and offices,

484

machine shops, service shops, welding shop, blacksmith shop, tinsmith shop, repair shops, electrical shop and the generating and distribution of electric current, carpenter shop, paint shop, plumbing shop, garage and automotive repairs, roundhouse, chemistry laboratory, concrete products plant, stables, lumber yard, firewood gathering and distribution, weighing, unloading and washing cane, removal and distribution of refuse, milling and processing cane into sugar and molasses, warehousing and loading sugar for shipment, handling bagasse and mill wastes, repairs and upkeep of many structures, including electric lines, building and repairing dwelling houses of which the company owns 820, maintaining hospital, sanitation work, garbage disposal, street cleaning, tree pruning, recreation club houses, gymnasium and athletic fields upkeep, together with numerous other activities.

The quality of employees range from hoemen and common laborers to highly trained artisans and mechanics, surveyors, engineers and technicians, with accountants, cashiers, statisticians, personnel men, overseers, timekeepers and store-keepers.

The farming operations of the plantation are continuous the year around, various activities such as planting, cultivating or harvesting going on in different fields at the same time. Crops come to maturity in from 20 to 24 months in different fields, and this is all planned to coordinate with harvesting and milling operations which are suspended about three months each year. Mill operations are on a 6-day a week basis and continuous around the clock in three 8-hour shifts; several other activities are largely in two 8-hour shifts; depending on seasons.

The main managerial business of the corporation is conducted through a plantation agency house in Honolulu where most of its officers and directors are centered. The manager, residing on the plantation, is essentially a superintendent of plantation operations and he and his aides plan and direct the timing and coordination of all principal activities, other than those managed by Honolulu officers.

The questions presented are:

1. Are the employee-defendants, and all other employees similarly situated, "employed in agriculture" as the term "agriculture" is defined in Section 3(f) of the Act, and therefore exempt from both the minimum wage and overtime provisions of the Act, as set forth in the exemption in Sec. 13(a) (6) of the Act?

2. If said employees are not so exempt, are any or all of them exempt from the overtime provisions throughout the year, or any part thereof, by virtue of Sec. 7(c) of the Act which provides that "in the case of an employer engaged * * * in the processing * * * sugarcane * * * into sugar (but not refined sugar) or into syrup", the overtime provisions of the Act (but not the minimum wage provisions) "shall not apply to his employees in any place of employment where he is so engaged"?

3. Are the employee-defendants, and those employees similarly situated, when they are engaged in any one week exclusively in building, repairing or maintaining plantation houses or related domestic facilities, "engaged in commerce or in the production of goods for commerce" as the term "commerce" and "produced" are defined in Section 3(b) and 3(j) of the Act?

Sections and subsections of statutory provisions of the Act which are involved, are as follows:

Section 3(b) " 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof."

Section 3(c) " 'State' means any State of the United States or the District of Columbia or any Territory or possession of the United States."

Section 3(f) " 'Agriculture' includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in section 1141j(g) of Title 12 [as amended]), the raising of live-

stock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market."

Section 3(j) " 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

Section 6 provides for minimum wages to be paid to all employees engaged in commerce or in the production of goods for commerce. Minimum wages are not here in controversy.

Section 7(a) provides for maximum working hours for employees who are engaged in commerce or in the production of goods for commerce, except as otherwise provided in this section, and subsection (c) of the said section provides, "in the case of an employer engaged in the first processing * * * of sugar beets, sugar beet molasses, sugarcane or maple sap, into sugar (but not refined sugar) or into syrup, the provisions of subsection (a) shall not apply to his employees in any place of employment where he is so engaged."

Section 13(a), provides that Sections 6 and 7, as above, of the Act shall not apply with respect to, "(6) any employee employed in agriculture".

The contentions of the plaintiff are:

"a. That all of the employee defendants, as well as all other employees of plaintiff similarly situated, are employees 'employed in agriculture' as the term 'agriculture' is defined in Section 3(f) of the Act and that, therefore, all employees are exempt from the overtime provisions of the Act, i.e., Section 7(a), as provided by Section 13(a) (6) of the Act;

"b. That the employee-defendants and any other employees of plaintiff similarly situated, who are engaged in the transportation of sugar cane from the fields to the mill, the processing of sugar cane into raw sugar including the temporary storage and shipment of raw sugar, and their necessary and related operations, are also exempt from the overtime provisions of the Act by virtue of Section 7(c) thereof, since they are employees in a place of employment where their employer, i.e., the plaintiff, is engaged in the 'processing of * * * sugar cane * * * into sugar (but not refined sugar) or into syrup * * *'. In this connection plaintiff further contends that such exemption is applicable throughout the year, including the 'off season', and

"c. That the employee defendants, when they are repairing and maintaining the plantation houses and related domestic facilities, and all other employees of plaintiff when they are performing similar work are not 'engaged in commerce or in the production of goods for commerce' as the terms 'commerce' and 'produced' are defined in Sections 3(b) and 3(j) of the Act, and therefore the provisions of the Act do not apply to said employees; but even if they are so engaged, they are exempt from the overtime provisions of the Act by virtue of Section 13(a) (6) or of Section 7(c)."

The contentions of the defendants are:

"A. That none of the defendant-employees, nor other employees of plaintiff similarly situated, are exempt from the provisions of the Act by virtue of Sec. 13 (a) (6) or Sec. 7(c), save as follows:

"(1) Such employees may be exempt under Sec. 13(a) (6) during work-weeks when they are engaged exclusively in work performed immediately and directly in the cultivation and tillage of the soil, and the production, cultivation, growing, and harvesting of sugar cane. In this connection defendants contend that harvesting is completed immediately upon the severance of the sugar cane from the earth so that where sugar cane is severed from the soil and thereafter placed into rail cars, even though

by the same machine or machine process, the placing of the cane into rail cars is not harvesting and is not exempt.

"(2) Such employees are exempt under Sec. 7(c) during the work-weeks when they are engaged exclusively in tasks and duties performed directly, immediately, and exclusively in connection with the processing of sugar cane. In this connection, defendants contend that the processing of sugar cane is commenced with the washing operation at the mill and is completed when the crystals of sugar are removed from machines into either bins or bags. Hence tasks performed by employees of plaintiff prior to the washing operation, as well as after the raw sugar is placed in bins or bags, are not exempt. Defendants further claim that none of plaintiff's employees working in and about plaintiff's mill are exempt under Sec. 7(c) during the off-season referred to on page 32 et sequi of the Stipulation of Facts on file herein, or during work-weeks in the grinding season when they perform any work in and about the mill during the 24-hour shutdown period referred to on page 21, et sequi, of the Stipulation of Facts.

"B. That all of the employee-defendants and all other employees of the plaintiff who are similarly situated, including those engaged in the maintenance and repair of plaintiff's dwelling houses and other facilities, are 'engaged in commerce or in the production of goods for commerce' within the meaning of Sec. 7(a) of the Act. * * *"

When the burden is placed on a busy trial court to interpret singlehanded the true and full meaning of a complicated Act of Congress out of which important conflicting contentions have arisen, the judge is, quite naturally, in a difficult situation, particularly where the matters involved are of grave importance to a great industry and affect in a heavy degree the interests of a large number of workingmen, knowing as he does that other courts have held divergent views as to some of its parts and that his reasoning and findings will be placed for scrutiny and analysis before higher courts and eventually the highest court of the Nation. However, the life of a trial judge seldom runs in still waters, and the best he can do is to give his best efforts without wasting too much time in research and refinements.

■ At the beginning, I will say that in my opinion, practically every person employed in the work of a sugar plantation in Hawaii is employed in "commerce" as it is defined and dealt with in the Fair Labor Standards Act. The work, purpose, and aim of a sugar cane plantation is to produce the greatest possible amount of high content cane at the least cost, and then extract, or have extracted, the greatest profitable amount of juice from it and turn it into raw sugar and molasses for further refining and marketing abroad, and in the case of plaintiff, every person employed by it in furtherance of sugar production is, in such employment, an interlocking part of "commerce", whether his employment is in the fields, installing, operating or repairing machineries, cleaning yards surrounding plantation labor houses, or checking finished raw into carrier conveyances, and irrespective of whether or not his work comes within the two exempted classifications, "agriculture" or "processing". He need not be working directly in the production of any "commerce" commodity, so long as his occupation is specially necessary in the practice undertaken for its production.

The first contention of the plaintiff, that all of its employees are "employed in agriculture" as the term "agriculture" is defined in the Act, and are therefore exempt from the entire operations of the Act, would, of course, dispose of the case at once if adopted. I cannot possibly accept this as the intent and meaning of the law.

■ In framing the definition of "agriculture" Congress made it broad enough to cover every operation of preparing the soil and growing and harvesting sugar cane and, in the event it were marketed by the farmers, preparing and delivering it to market—everything incidental to "or in conjunction with such farming operations", but it certainly is clear that Congress did not mean nor desire this definition of "agriculture" to be construed to cover or include the "processing" of sugar cane into raw sugar; it would not have done part of

its work over again by formulating and enacting subsection (c) in Section 7, exempting the "first processing" of sugar cane from the maximum working hours provisions of the Act if it had intended "agriculture" to embrace this exemption. It is perfectly clear that Congress considered processing as something different from farm operations and not conjoint with it.

It is also quite certain that in framing and enacting the Fair Labor Standards Act, Congress had definitely in mind the humanitarian view that the time had come in American industrial affairs when workmen in interstate commerce transactions (which was as far as Congress could reach industry's hours and wages in legislation) should receive a fair standard of wages and be required to work for that wage no longer than 40 hours (after 1941) each work week. That this would add a burden on industry which, in all probability, would have to be passed on to the consumer was well known. Relief to workingmen was the overall consideration and purpose of the Act, as declared by the President, and as set forth in the "finding and declaration of policy" in Section 2 of the Act.

In the case of A. H. Phillips, Inc., v. Walling, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095, 157 A.L.R. 876, Justice Murphy speaking for the court, said: "The Fair Labor Standards Act was designed 'to extend the frontiers of social progress' by 'insuring to all our able-bodied working men and women a fair day's pay for a fair day's work.' Message of the President to Congress, May 24, 1934. Any exemption from such humanitarian and remedial legislation must therefore be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress. To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people."

■ Numerous courts and cases in dealing with the Act have emphasized that it is broad and comprehensive, having the special purpose of covering all workmen in commerce or the production of goods for commerce—except those specifically and clearly exempted—and that its remedial purposes should be liberally construed and its exemptions to coverage should be narrowly construed; this is reiterated many times and in many cases.

■ If we follow this concept, and I believe that to be the duty of the court, then it is plain that "agriculture", while it clearly includes farming in all its branches, several of which are enumerated in the Act's definition, as well as "other things", not specified, and practices performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, leaves a number of the operating acts and agencies of the plaintiff outside the definition of farming or "agriculture". My view is that the "other things" included in farming practices and incident to and in conjunction therewith, but not specified, were intended to cover the farming practices that are applicable and incidental to situations that may arise in the development of various kinds of produce in agriculture, horticulture, stockraising, bees, nurseries, forestry, etc., such as spraying, fertilizing, irrigating, pruning, pollinating, grafting, fire or frost protections, milking, slaughtering, shearing, hide preservations, castrating, branding, and similar practices that appertain to particular branches of farming, nursery and ranching.

It is conceivable from the theory advanced in plaintiff's first contention, that if an agricultural enterprise becomes large enough to embrace within its ownership and management a number of distinctively separate industrial operations which, when standing alone are indisputably covered by the Act, the exemptions given to it as a farm, would become applicable to all of its combined industrial operations. I cannot follow this theory all the way, for its application could work a defeat of the humane purposes of the Act through an increasing growth of powerful industrial concerns in acquiring ownership and bringing under their management non-agricultural sources of supply, and thus separating more and more workers from the wage and hours benefit of the Act and could even defeat "oppressive child labor" provisions contained in it.

A number of sugar plantation corporations in Hawaii are rapidly expanding by amalgamation with others and growing larger in capital resources and operations. The president of Hawaiian Sugar Planters Association in his annual report a number of years ago made the following logical and frank statement, which was printed in local newspapers, as well as in the Congressional Record: "As has been emphasized again and again, the primary function of our plantations is not to produce sugar, but to pay dividends."

■ If the situation were one involving a group of farmers who grew and harvested cane, the cane being transported by a railroad company or an independent trucking concern to a separately owned factory which processed it, plainly the agricultural exemption would be confined to the activities of the farmers. The transit activities of the railroad company could in no way be said to come under the agricultural exemption, no more than could the operations of a fertilizer factory from which the farmers procured their needed fertilizer. Similarly, the factory operations would be wholly separate from agriculture. Assuming that the farmers, the carrier, the fertilizer factory and the milling company united together, forming a corporation, and took title as a sugar plantation company, would it be entitled over all to the exemption intended for and given to the farmers? I do not think so; the substance of the situation is controlling, not its form, and the ownership and management of these several links that may be united together in the production of raw sugar and molasses does not seem of importance in construing the Act's meaning of "agriculture".

■ Plaintiff lays stress on the definition of the word "production", Sec. 3(j), and construes it to cover all forms and activities of transportation. I do not so construe the words "handling" and "transporting" as used in this Section. My opinion is that they refer to those operations in "agriculture", such as are involved in this case, in planting seed, promoting growth, harvesting, assembling produce for carriage, and associated activities up to that point; and in "processing", to the handling and transporting activities involved in getting the cane from the mill yard through the cleaning process, weighing it, and then into and through the mill and other processing operations to the point of shipment as raw sugar or molasses. True, some cases hold the meaning of both "agriculture" and "processing" to be restricted to much narrower activities than those above mentioned. We may never know with certainty the correct answers until the Supreme Court gives them.

■ The plaintiff contends that its employees who work in transporting cane from certain places in the fields to the mill are performing work essentially incidental to or in conjunction with a purely agricultural pursuit. A decision of the First Circuit Court of Appeals in Vives v. Serralles, 145 F.2d 552, found distinctly different, holding that, in the facts of that case, from the point of concentration of sugar cane in the fields, through the transportation operations thereafter up to the mill itself, such transportation activities were incidental to the operations of the mill and not to agriculture. I cannot believe that either view is correct. The agricultural aspect terminates upon the harvesting and loading of the cane into cars for transport to the sugar factory. The train crews are not engaged in any act of producing sugar cane, nor in processing it into sugar merely because they are employed by the same company that employs the farm hands or processing crews, and Section 7(c) does not embrace activities which are "incidental" to or in conjunction with mill operations. It does not mention incidentals. In this section, the Congress expressed its intention of exempting from the maximum hours provision of the Act only those mill employees engaged in processing cane into raw sugar or molasses. Railroad operation is a systematic business calling for the employment of skilled, experienced men, trained to quick, keen perception (not farmhands or millhands) for handling locomotives and moving cars (not the goods in transit) and for the maintenance of roadbed, track and structures, and roundhouse care and servicing of locomotives—all specialized technical work. It is as different from farming

or processing operations as day is to night. The nature of work an employee does, that is the thing that controls the question as to whether his work is within or without the protection of the Act, not the classification that his employer, whether farmer, manufacturer, or exporter, gives to the job.

"In determining whether an employee is exempt from Fair Labor Standards Act, the criterion is the character of work performed as disclosed by the record rather than by title of employee's position". Walling v. Snyder Min. Co., D.C., 66 F.Supp. 725, 726.

If a man is employed to drive a timbered tunnel into the earth he is employed as a miner, no matter if a farmer hires him, pays his wages, and the tunnel is on a farm, nor would it matter how needful the tunnel was to the economy or facility of the farmer's business in connecting two divisions of his farming business; he could not be classed as an exempted farm employee, irrespective of whether his work was in or out of commerce.

I consider mainline railroading as entirely apart from agriculture, as defined in the Act, even though the road may be owned by one engaged in agriculture and hauls nothing but agricultural produce produced by him, and this would apply to automotive trucking of produce for processing as well. About 462,500 tons of cane are handled on Waialua Plantation in a year—a very substantial transport operation, over many miles of trackage.

If Congress had said that raw sugar production should be given an exemption from the operation of the Act, that would have been a different proposition; but the parts of the Act here dealt with exempts only agriculture or farming on one hand, and processing on the other. As an illustration: If lumber production were exempted, it would include logging and all forms of transportation and other operations necessary to the business up until the production of lumber. But if two factors only, that is, forestry, including its harvestry and its "preparation for market, delivery to storage or to market or to carriers for transportation to market", and lumber mill processing (but not surfacing or other refinements) were given different and separate exemptions, then the transportation of the logs from the forest to the distant mill would be a separate activity, so distinct in its nature that we could not extend the reach of either forestry or milling exemptions to encompass it.

In my opinion, all employees who are employed in or on the roadbed, tracks, structures, cars and locomotives of plaintiffs' railroad system, including roundhouse and rolling stock, repair and building shops, and flagmen, watchmen and dispatchers, are covered by the Act. Further, I believe that where automotive trucks are substituted for locomotives and cars in carrying plantation freight, their operators likewise, with their upkeep crews, are covered.

As to the portable tracks for getting loaded cane cars in and out of the fields for loading and back to the reach of locomotives, as described in this case, my opinion is that the laying and shifting of these sectional tracks and the loading and moving, by hand, horse or tractor of cane cars placed upon them is a part of the harvesting operation and the assembling of the harvested crop at centralized points ready for transportation, and is therefore incidental to cane farming. Certainly all the ordinary field operations, pertaining to the growing and harvesting of a cane crop, come within the exemptions given to farming, and this is such a field operation. Also, the picking up and reloading by field employees of cane stalks which have fallen from cars between the fields and the mill, I consider a part of harvesting.

Good argument, supported by authorities, has been advanced by defendants that these operations performed on laying and shifting portable tracks and the moving of cars over them are not covered by any exemption, as they are neither agricultural or processing work, but performed by separate gangs of men who are specialized and work at nothing else during harvesting seasons, touching neither farming, harvesting or processing. This presents a close question, however, my reasoning dictates that this work being necessary to and closely related to

harvesting and loading, in positioning and spotting empty cars in the fields and then getting them off the tillable fields, back to points where they can be reached by locomotives operating on the mainline, is, under practices long established and prevailing on plaintiff's plantations, an essential part of harvesting.

We now come to the mill or factory operations, which are exempted as to hours, but not as to wages, to consider how far this exemption was intended to reach.

Congress was clearly aware of the fact that harvested crops of many horticultural and farm produce, including sugar cane, are subject to rapid deterioration and perishment, and, from discussions at Congressional hearings, it appears that a number of members of Congress were unquestionably acquainted with sugar cane and sugar beet farming as practiced in their sections of the country where such crops are seasonal and often come to the processing plants from numerous producers whose harvesting operations and transporting facilities may be not fully coordinated with milling operations. It is plain that in sympathy with the problems of this class of seasonable crop farmers and processors, and in public interest as to sugar consumers, which includes practically every household of the nation, Congress felt not only justified but eager to relieve them and all other perishable crop processors of the burden of overtime wages (for 14 weeks of each year, as to other farm produce processors) to employees in any place of employment where they are engaged in the operation of "first processing".

█ We have seen that this exemption to "processors" is separate and distinct from the exemption given to "agriculture"; it is a lesser and limited exemption. How far does it reach outside of the processing plant, or mill, in the case of sugar, if any distance? My opinion is that the Act was intended to reach to the produce to be dealt with after it is brought alongside its unloading platforms or delivered to it in its storage yard in which it has its own facilities, by gravity and mechanical traction, for bringing it into actual processing operations.

From there on, Section 7(c) of the Act clearly exempts all acts that are involved in processing the cane into raw sugar, and I hold that this includes weighing, cleaning, crushing, juice treatments, crystallizing, and the bagging of the product and the removal of it from bagging and sewing machines and depositing it in an adjacent warehouse, bins, tanks, or directly into cars or trucks, if immediately available alongside the bagging room, for shipment. With these several operations through the factory the processing is begun and finished in the place where the processor is so engaged. Place where processing is carried on, conveys to my mind a meaning of the entire operating plant devoted to processing usage, whether within a building or open yard, and whether work there performed is mechanical or manual.

Evidence and argument discloses that in the boiler room, attached to the factory, steam is produced by burning bagasse, also fuel oil, under boilers and that part of this steam is used in engine power in driving the mill and otherwise in processing operations, and that part of it is used to generate electricity in a separate building, some of which electricity is used in the mill and mill yard, as well as in the fields, and some in lighting employees' houses, offices, and for various domestic, recreational, and other purposes; occasionally small surplus amounts are sold to a public utility company. This usage raises a question as to whether or not the boiler room operations are exempt from the operations of the Act.

In the administration of the Act the Administrator, whose powers and duties are provided in the Act, has had the necessary duty from the beginning and from time to time of interpreting the Act. In an Administrative Interpretative Bulletin No. 14, which was put in evidence, the statement is made in paragraph 23(a): "It is our opinion, therefore, that only the employees who perform the operations that are so closely associated thereto that they cannot be segregated for practical purposes, and whose work is also controlled by the irregular movement of commodities into the establishment, are covered by the exemption. for example, in the ordinary case, none of the employees in a department separate

from the department in which the exempt operations are performed will be exempt."

And in Paragraph 18 of this Bulletin we find the following: "Operations performed on bagasse, such as removing same from the sugar mill, baling and compressing, are not included in the exemption, since such operations do not constitute the 'processing of * * * sugar cane' and further such operations do not result in sugar or syrup. The exemption, it should be noted, is limited to the processing of sugar cane 'into sugar * * * or into syrup'."

While it is true that administrative interpretations are not necessarily binding on courts, all courts agree that they are entitled to careful consideration and weight, particularly if they have had controlling effect for a considerable length of time. So far as I have been able to find, the above cited interpretation has not been discarded by any court, but was affirmed in Shain v. Armour & Co., D.C., 50 F.Supp. 907, and Walling v. Bridgeman-Russell Co.,[1] 2 Wage & Hour Cases, 785–790—this rule is not inconsistent with the manifest intention and spirit of the Act and was clearly for the purpose of suppressing mischief and promoting the remedy.

It is my opinion that the rule is sound, that where an employee in commerce is assigned to perform, in a given work week, some work which is exempt and some which is not exempt, all of that particular employee's activities for the entire week are entitled to the protection of the Act. The work week is the basis for measuring maximum hours time in Section 7 and, if no basis were adopted, there would be uncertain protection to employees in many conceivable cases. I therefore hold that employees in and about the boiler room who work in supplying fuel to the boilers, and those who tend the engines, dynamos, and other machinery and equipment used to generate and transmit electricity, are covered by the Act, whether they are in or outside the mill buildings.

This rule applies to and brings within the full protection and benefits of the Act every plantation employee of the plaintiff who works any part of any work week in employment that is not exempted by either the agriculture or processing exemptions. In making this clearer, I will say that if an employee works part of a work week in farming in the fields or in processing, and the remainder of the work week in employment not incident to or in conjunction with field farming work or directly and exclusively connected with processing operations, he is covered by the Act for the full work week; if he works the entire week in either or both farming and processing, he is not covered, as the employer in both activities is exempt.

Now, as to "off-season" work, in the processing plant and elsewhere. If we are to follow the strict construction rule as to exemptions, and I believe it incumbent on me to do so as, so far as I can find, a preponderance of other courts do, then it is clear, in this case, that there is no processing during the time the processing plant is shut down—other than occasional drying of small amounts of low grade sugar called massecuite and the processing which nature performs in the crystallizers and on heavy molasses in settling tanks.

It matters not whether the processing operations are discontinued for a day or three months so long as there is a complete shutdown or suspension of processing. However, it is my opinion that a halt in some operations on account of breakdown of machinery or other gear or service, so long as any mechanical or manual processing operations are in action and the operating staff is in part working or standing by waiting for repairs or adjustments to be made, is not a discontinuance of processing, unless and until workmen in the essential factors of processing are released from those duties.

I am aware that all authorities do not agree with this view as to shutdowns, one or two believing that seasonal cleanups and repairs, even new machinery installations, are an essential part of processing, but my opinion is that this strains the meaning of processing and could carry it into a great variety of capital expenditures and side lines. Getting ready to process is not

---

[1] No opinion for publication.

processing, nor is cleaning up after the processing is done. The employee, as well as the employer, must, at the time, be "engaged" in the processing to bring into operation the exemptions; it is not enough that the employer be merely established in the business of processing.

I lean strongly to the view expressed by the district judge on the ground in Puerto Rican case of Mainsonet v. Central Coloso, Inc., 2 Wage & Hours Cases, 753, wherein the court said: "The primary purpose of the exemption in question is to permit the employment of persons in seasonal industries, particularly where perishable commodities such as sugar cane is concerned, without the hardship of paying overtime * * *. But this situation does not obtain during the dead season. There is no similar reason why employees should work more than 40 hours in 'construction and repair work and preparation of the mill for the coming grinding season (azfra)'."

In McComb v. Consolidated Fisheries Co., D.C., 75 F.Supp. 798, cited by plaintiff, it appears that the court's judgment was swayed by the view that there was no shutdown season in that case, as processing continued daily and some 200 tons of fish scrap were processed during the time that no additional fish were brought into the plant.

Both parties stipulated orally in the trial and have since done so in writing, praying for a special hearing on the status of each one of the employee-defendants whose work is discussed in the pleadings and voluminous stipulations.

Inasmuch as all parties seek declaratory guidance from the court in respect to future activities and pay practices, as well as a determination of past liability, it seems appropriate, if not incumbent upon the court, to say again and indicate at random a few situations which would call for application of the rule that commingling the work of employees in exempt activities with activities that are not exempt under the law, brings all activities of that employee, within any work-week, under coverage of the Act.

The burden of proof is upon the plaintiff to show that an employee comes within the exemptions. Bowie v. Gonzales, 1 Cir., 117 F.2d 11, and the exemptions must be strictly construed in order to secure liberality of coverage.

On this basis of understanding the parties should be able to arrive at an agreement as to each employee without further trial.

Illustrations, which are merely indicative:

Timekeepers whose duties include keeping time for both covered and exempt workers are, in any work week in which their work is thus dual, covered for the entire week; the same is true of warehousemen and material clerks whose business it is to dispense or account for repair parts or materials and supplies to both exempt and covered workers; laborers who load stones on conveyances in the fields are covered by the law if such material is to be used for structural building or repair work other than the conservation of the fields or farm lands; likewise, machinists in the mill who at times perform work for use outside the mill are controlled by the work they perform in any work week, and artisans, mechanics, and laborers throughout the entire plantation organization are covered, unless in any work week their employment is wholly and strictly within the exemption given to agriculture or processing as these operations are circumscribed by interpretations hereinabove set forth.

If the parties are unable to adjust their differences and if further trial is desired on points that are considered to be in controversy, which are at issue in the pleadings, and which are not dealt with herein, or, if either party desires further findings and shall present the same by motion to the court within 30 days, the same will be given consideration and hearing at a time to be fixed by the court.