**WAIALUA AGRICULTURAL CO.,**
**Limited**

v.

**MANEJA et al.**

No. 13114.

United States Court of Appeals Ninth Circuit.

May 5, 1954.

Rehearing Denied June 24, 1954.

Writ of Certiorari Granted Nov. 8, 1954.

See 75 S.Ct. 111.

Rufus G. Poole, Milton C. Denbo, Washington, D. C., Livingston Jenks, Anderson, Wrenn & Jenks, Ernest C. Moore, Jr., Pratt, Tavares & Cassidy, Honolulu, Hawaii, for appellant.

William S. Tyson, Sol., Bessie Margolin, Asst. Sol., William A. Lowe and Harold S. Saxe, Attys., Dept. of Labor, Washington, D. C., amicus curiae.

Richard Gladstein, Gladstein, Andersen & Leonard, San Francisco, Cal., for appellees.

Before HEALY, BONE, and FEE, Circuit Judges.

JAMES ALGER FEE, Circuit Judge.

This case must be reversed for error in approach. Waialua initiated the procedure by petition for declaratory judgment. The trial court, misled by the nature of the cause and the attitudes of the parties, decided the wrong issue.

The status of Waialua was tried out. It was contended by Waialua that it was engaged in agriculture, and therefore all of its employees were exempt from application of the statute. The trial court, in its first declaration, which was reversed for lack of findings, and in its present declaration and judgment, took the converse position. It has held that Waialua, through corporate affiliations, interlocking directorates and factor relationships, was a manufacturer of refined sugar on the mainland, and there engaged in interstate and foreign commerce.[1]

By agreement of all parties and the Department of Labor, that Court finds that all employees of Waialua except one group [2] "are engaged in commerce or in the production of goods for commerce." Therefore, it was concluded that every employee of Waialua on Oahu, Territory of Hawaii, was subject to the drastic provisions of the Act for each work week in which he did not spend every employed hour in an activity such as planting, irrigating, cultivating, ratooning or cutting and loading cane.[3] In pursuit of the fallacy so induced, the Court refused to describe each employee who harvested the crop by reducing cane to raw sugar and molasses, an operation essential to its preservation, as an agricultural worker.[4]

1. The trial court found that Waialua does not "directly engage in any sugar refining operation." D.C., 97 F.Supp. 198, 203.

2. This group is composed of employees who perform the work of repairing and maintaining dwelling houses in the mill village. These employees the Court found, independently of agreement, were employed in the production of goods for commerce. 97 F.Supp. 198, 226–232.

3. These activities are particularized by the trial court at 97 F.Supp. 198, 219, paragraph [3].

4. The trial court, disregarding an express direction of this Court, allowed the processing exemption, which is beside the

221 Thus the trial court did not give effect to the language of the statute which excludes from its operation anyone "employed in agriculture" [5] and defines "agriculture" to include "farming in all its branches and among other things * * the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural and horticultural commodities * * * and any practices * * * performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation, for market, delivery to storage or to market or to carriers for transportation to market."[6]

■ After a remand upon a previous appeal,[7] on motion of Waialua, the International Union was eliminated and its Secretary, Jack Hall, stricken from the defendants. The representative character of the original proceeding was also abandoned. The individual workers, most of whom were retainers and dependents of Waialua although union members, were permitted to file a so-called cross-complaint, praying for relief in sums of money, and this time several of these individual employees gave testimony as to the kind of work each did. None of these devices, adopted to meet criticism of this point. The activity was excluded by the terms of the Act. In its previous opinion, 9 Cir., 178 F.2d 603, this Court stated: "Not only was it the desire to exempt processing as a part of the harvesting done by a farmer or on a farm, but also processing done by a third party. These provisions are not alternative or mutually exclusive, and should be liberally construed for the reasons given by this Court in McComb v. Hunt Foods, Inc., 9 Cir., 167 F.2d 905, 908." 178 F.2d at page 609. The processing exemption, 29 U.S.C.A. § 207(c), is directed primarily toward that "processing done by a third party." See also Walling v. Peacock Corp., D.C., 58 F.Supp. 880, 883; Redlands Foothill Groves v. Jacobs, D.C., 30 F.Supp. 995, 1006.

Court, changed the fundamental character of the proceeding. The individual employee cross-complainants still seem "pawns in this battle of the demi-gods." Waialua seems to act to preserve relations with the Union and a federal bureau, as a policy. Practically all facts are agreed and, as above noted, constitutional and jurisdictional conclusions as to coverage were accepted. Thereby, emphasis was placed upon the wrong problems.[8] This conjugation by consent removes the cause from the class of "cases and controversies" and is an abuse of declaratory judgment procedure. The only bitterly partisan litigant is an executive bureau not named in the record as a party. Notwithstanding a plain warning of this Court upon the last appeal that such evidence was impertinent to the whole question as to whether the individual employee was an "agricultural worker," the parties introduced at this trial and the Court adopted as a basis for decision two treatises. These were entitled, respectively, "Labor in the Territory of Hawaii, 1939"[9] and "The Economy of Hawaii in 1947,"[10] studies made under the supervision of a department of the government, which, as noted above, took an active part not only in the trial court, but on both appeals.

5. 29 U.S.C.A. § 213(a) (6). "* * * the raising and harvesting of sugar were specifically given consideration by Congress on account of the immense importance to the economy of this country as a whole." Waialua Agricultural Co. v. Maneja, 9 Cir., 178 F.2d 603, 608, paragraph [6–8].

6. 29 U.S.C.A. § 203(f).

7. Waialua Agricultural Co. v. Maneja, 9 Cir., 178 F.2d 603, certiorari denied 339 U.S. 920, 70 S.Ct. 622, 94 L.Ed. 1344.

8. The suggestion of the trial court in one opinion that the exclusion of agriculture would free farmers from the "oppressive child labor" provisions of the Act need not be too much regarded. Such a problem does not exist. And we have come a long way from sound thinking in America if it be suggested that a farm boy should not work on a farm. Of course, the bureaucrats could take much better care of him.

9. James H. Shoemaker, U. S. Bureau of Labor Statistics, United States Government Printing Office, 1940.

10. Bulletin No. 926, United States Department of Labor, United States Government Printing Office, 1948.

Thus a false issue was created. Instead of concern with the question of who was employed in agriculture, the attention of the Court was deflected to a consideration of membership of Waialua in a non-profit sugar refining and marketing cooperative called "California & Hawaiian Sugar Refining Corporation, Ltd.", of California, which was engaged in the manufacturing business of refining raw sugar, marketing the product, and transporting the refined sugar to the consumers.[11] But all the activities of the latter were carried on upon the mainland. No one of its employees is here involved. None of the workers of Waialua was employed by the cooperative.

If the pertinent question of employment in farming had been considered instead, then the language of the statute defining such employees would have been given effect.[12]

The decisions of this Court bear out the breadth of the exclusion of agricul-

tural workers. Dofflemyer v. National Labor Relations Board, 9 Cir., 206 F.2d 813 (Judge Healy) shows that technical distinctions should not be used to circumscribe the words "farmer" and "farm" as used in the Act. The necessity for immediate processing of a farm product is of great force in emphasizing the scope of the agricultural exclusion, according to Judge Bone, writing for the majority in McComb v. Hunt Foods, 9 Cir., 167 F.2d 905, where the interpretations of three different district courts in widely separated agricultural areas of the mainland are followed. There the Court said:

" 'The policy of protection to the growers of "perishable and seasonal fresh fruits" is of as much force as that of the protection of general industrial workers. The objective of a uniform rule for hours and wages in manufacturing should not be allowed to prevail over the paramount necessity of garnering and preserving

---

11. A similar contention was made by the Administrator of the Wage and Hour Division, as a bitterly partisan litigant under the guise of amicus curiae in Miller Hatcheries, Inc. v. Boyer, 8 Cir., 131 F.2d 283, 285, where Judge Johnsen, in an illuminating opinion, held that employees of a commercial hatchery were excluded because "employed in agriculture." There the Administrator contended "that the hatching of baby chicks by a commercial hatchery is an industrialized and highly specialized activity which does not itself have any direct connection with 'farming operations'; that the economic function of such an urban establishment is completely disassociated from the agricultural activities", that "thus transposed from the farm to a commercial establishment it ceases to be a technical farming activity" and that "the attributes of farm labor which justify its exclusion * * * ought not to be regarded" as extending to a commercial operation.

This compares with the contentions of the Administrator here: "To accomplish its purpose of producing raw sugar, appellant plainly engages in many separate and distinct enterprises appropriate to that end, including manufacturing and transportation, as well as farming. This integration of business operations neither

conceals the essential nonagricultural character of appellant's manufacturing functions nor submerges the fact that appellant, in operating a hybrid type of business, has assumed the functions of a manufacturer and a railroad company, as well as those of a farmer. * * * Just as the chain store cannot obtain the retail exemption for its central office and warehouse merely because the services of those units are restricted to exempt retail outlets, so here, appellant cannot achieve exemption for its separate manufacturing function and its railroad activities simply because it utilizes them only for the products of its farm."

12. In an interesting case parallel to this in another food supplying industry, the Court of Appeals of the Third Circuit held, in an able opinion by Judge Maris, that all employees necessary to carrying on a fishery and fish processing activities were "exempt by the plain language of Section 13(a) (5) of the act." McComb v. Consolidated Fisheries Co., 3 Cir., 174 F.2d 74, 78. It should be marked with red on the margin of this case that the Administrator was there contending that all employees of a farmer, including those engaged in first processing, were excluded by the language, but that the exemption to fish processors was much narrower.

fruits and grains and the protection of those who grow them when Congress equally recognized both in the Act. The hypertechnical reasoning concerning "exceptions" and "exemptions" has no place here. A direct expression of non-applicability constitutes neither.'

"This is but another way of saying that if the business operations claimed to be exempt are found to fall within the exempt classification, the statute is, as to them, a 'remedial' statute. We agree with the lower court that no formalistic characterization should be permitted in dealing with any of these clauses since the plain intention of the statute should be carried out." 167 F.2d at page 906.

■ The trial court was thus in error in requiring Waialua to prove beyond peradventure the affirmative of the proposition that each worker was employed in agriculture and in activities by a farmer and on a farm. By an unwarrantedly strict construction, Waialua was required to establish exemptions beyond a reasonable doubt, as though it were negativing a jurisdictional proviso in an indictment.

Upon the former appeal, to which reference has been made, the Court questioned the aptness of the declaratory proceeding, but remanded because the findings were not sufficient to support any judgment. The findings before us are now meticulous and exact as to the hours and type of work performed by each worker defendant during each work week in question. However, the trial court failed to find many vital facts which the record, as we view it, bears out, and made many findings which are

clearly erroneous. For these reasons alone, the cause must be reversed.

■ A vital finding contains the implication that sugar cane can be stored in Hawaii three or four days without spoiling.[13] In fact, a delay of three or four hours is apparently deleterious, and for best results the cane, after cutting, should move continuously from field to crushing mill.[14] The Court concludes that no worker at the crushing mill is employed in agriculture but is exempt only insofar as he assists in first processing. If necessity for immediate treatment for preservation had been found, the Court would have been impelled to find an employee at the mill was engaged in "harvesting" an agricultural product. The Court found transportation of cane from fields to cars was farming, but carrying of cane on cars drawn by a locomotive from loading points to the mill was "railroading" and transportation in commerce. Again, the railroad and its crew performed no other kinds of transportation, and therefore what each did was "harvesting." The complete operation was vitally necessary to put the crop into a form in which it would not spoil and, as "raw sugar," could be transported to the mainland for manufacturing. Any activity of any employee which assisted in this operation, whether furnishing power to the mill or hauling cane from field to mill, fell within the express word "harvesting" used in the enactment. Such a finding was not made. Those which were made were erroneous.

■ Even if it could have been concluded that these activities were not "harvesting," they were nevertheless carried on by a "farmer."[15] Furthermore, such activities were performed "on a farm." On either of these inde-

13. 97 F.Supp. 198, 203.

14. "Sugar cane is highly perishable * * * and starts to deteriorate immediately after harvesting. To avoid serious losses, it must be processed into sugar, syrup or molasses within a few hours after it has been burned or severed from the ground." Stipulation of Fact, Part. I, § 4.

15. Employees of a "farmer" who work in or out of a store, transporting, packing and selling plants in connection with a wholesale and retail outlet located in a city four miles from the "farm" are held to be employed in agriculture. Walling v. Rocklin, 8 Cir., 132 F.2d 3. "The raw products were at most being prepared for market in connection with the business of producing them." 132 F.2d at page 6.

pendent grounds, workers so employed were excluded by the enactment.

But the Court failed· to find that Waialua was a farmer.[16] The record and stipulations show conclusively that all activities of Waialua upon the island of Oahu were concerned with growing, cultivating and harvesting sugar cane. It should have been found that Waialua was a farmer, and all workers performing functions for it on the plantation were employees of a farmer. It should have been found that transportation of cane to the mill and the crushing and drying of the raw sugar therefrom were activities performed by a farmer as incidents to and in conjunction with farming operations, including harvesting, preparation for market and delivery to storage. Findings of fact which have contrary implications are clearly erroneous.

█ The trial court also found neither railroad nor crushing mill were "on a farm."[17] The admissions, maps and other exhibits indicate all the activities of employees of Waialua were carried on within the boundaries of a single parcel of land described as a "plantation."

The railroad and the mill [18] were located upon a plot of ground and appurtenances all of which were in exclusive possession of Waialua. Practically all the area was also in its "ownership,"[19] although some acreage was leased and one field was connected with the main body by a right of way for moving its agricultural equipment, supplies and sugar cane. By far the greater percentage of the ground in the area was devoted to raising and harvesting of sugar cane in a year round process as an integrated operation. This situation dictates that the locus in quo be found to be a "farm."[20]

If then the particular activity of an employee was neither "cultivation and tillage of the soil" or "the production, growing and harvesting" of this crop, he was engaged in a practice performed "by a farmer or on a farm" under the conditions set up in the statute.[21]

16. The trial court held, contrary to the stipulations and evidence, that Waialua "assumed a variety of functions including those of farmer, carrier, manufacturer, shipper, and operator of village communities." 97 F.Supp. 198, 218.

17. The trial court apparently confines the meaning of the word "farm" to the fields upon which cane is actually grown, for it is pointedly said in the opinion, "Obviously cane is not grown on the right-of-way occupied by the fifty-six miles of permanent main line railroad track." 97 F.Supp. 198, 222. Cane probably does not grow on roads where ox teams hauled cane.

18. The trial court's opinion states that the mill was on the plantation. 97 F.Supp. 198, 204.

19. Discussion of the peculiar land system of Hawaii is not necessary.

20. National Labor Relations Board v. John W. Campbell, Inc., 5 Cir., 159 F.2d 184, 187: "The argument that the Respondent has 1,000 acres planted in tomatoes and grows, packs, and markets many carloads in a season and, because of the very nature and size of its operation, should be held to be engaged in an industrial enterprise as distinguished from the pastoral pursuits of a farmer, will not do. The exemption was not restricted to the forty-acres-and-a-mule farmer. It is not measured by the magnitude of his planting nor in the prolificacy of his harvest. In Larson v. Ives Dairy Co., 5 Cir., 154 F.2d 701, 702, we said: 'Here, however, there is but a single enterprise, and that a dairy farm. * * * The size of the farm, of course, does not matter —it is still a dairy farm.' Here, also, the growing, harvesting, packing and selling are all a part of a single enterprise."

21. "Congress, as well as this Court, has recognized that the packing and preparing of agricultural products for the market is a necessary incident to any agricultural operation, for no farmer, dependent upon that which he produces to sustain his operations, could long exist if he could not market that which he produces, and so long as the operation of washing, packing, and preparing for market by the employees of a farmer is on that only which he has produced on his farm, it is a necessary incident to farming and is agricultural labor. The wheat farmer must thresh his wheat; *the cane grower must cut his cane and make its juice into syrup;* the cotton grower must

■ Misled by the apparent whole-hearted agreement as to the constitutional and jurisdictional conclusion regarding preparation of goods for commerce, the trial court inferred that a worker engaged in any operation or practice which was considered not farming by the strictest classification was covered by the enactment. We emphasize that, if it had been found that reduction of cane to raw sugar or molasses almost immediately after cutting is an imperative necessity, the palpable falsity of such sequela would have been patent. The integrated operation required making of repairs on the crushing mill while shut down for three months for that purpose, the repair and overhaul of the various machines used in cultivating, cutting and hauling, and the furnishing of power for the mill, including the hauling and burning of bagasse [22] in the furnace thereof.

■ In order to show how obviously it was on the wrong path, it may be observed the trial court concluded employees assisting in repair and maintenance of houses, and the operation of services and facilities of villages on the plantation, where some of these agricultural workers lived, including the street sweeper and those who picked up wood for cook fires, were engaged in the preparation of goods for commerce. In this conclusion, which

even the Department of Labor does not attempt to defend in its current argument, the trial court betrays emotional aversion for the semifeudal relationships which still exist in a dependency where the perquisite system abolished by Waialua under pressure still exists.[23] The fact that some of the retainers have lived in these houses of the overlord for life or for more than forty-five years [24] is not good reason to apply the Fair Labor Standards Act, even if this Court also disapproves of the condition.

The furnishing of housing and facilities for a purely agricultural community is local in its nature.[25] Perversion of concepts and language is essential to transmute irrigation of a growing crop, harvesting by performing processes immediately necessary for crop preservation, or furnishing essential housing to farm workers, into the production of goods for commerce. Mere rationalization will not metamorphize the practice of furnishing housing to workers so engaged into manufacturing. Such conveniences are traditionally furnished in the several states in larger operations of farms, ranches, orchards and plantations. In any event, here the furnishing of quarters for such of its workers who desired to live on the plantation on ground owned by Waialua was a convenient adjunct of farming.

gin and bale his cotton; the citrus grower must pick and pack his oranges; and the tomato grower must do likewise. So long as these undertakings are in the preparation and packing by him for market of that which he has grown on his farm, the labor necessary thereto is agricultural labor." National Labor Relations Board v. John W. Campbell, Inc., 5 Cir., 159 F.2d 184, 187 (emphasis added).

22. The end residue of the cane after abstraction of the juices.

23. The District Court describes the perquisite system at 97 F.Supp. 198, 214. By a collective bargaining agreement effective November, 1946, this system was abolished and the value of perquisites previously allowed was converted into cash wages.

24. See the tabulation prepared by the trial court, 97 F.Supp. 198, 215.

25. In a case where the employer was engaged in manufacturing, it was said, " * * * the plaintiffs were not covered by the Act while engaged exclusively in 'the construction, maintenance and repair of the residences in the mill village owned by defendant and occupied by its employees'; or, to state the matter differently, while the plaintiffs were so employed they were not engaged in the production of goods for commerce as that term has been defined." Morris v. Beaumont Mfg. Co., D.C., 84 F.Supp. 909, 910–911. Coomer v. Durham, D.C., 93 F.Supp. 526, is an interesting case wherein building and repair of houses by employees of a coal mining company engaged in the production of goods for interstate commerce under the Fair Labor Standards Act is discussed.

■ We are forbidden by statute, custom and rule from making new findings of fact, even where we believe these are demanded by the record. This prohibition does not vanish where, as here, comprehensive agreements of facts are made in writing and much of the proof is documentary while the testimony does not bear on the contested issues. Writings and agreements of the parties are notoriously meretricious in dealing with jurisdictional or constitutional questions. Where some findings are clearly erroneous, our duty is to reverse.

■ This brings us to a consideration of a constitutional question of some magnitude. Should a statute of general application throughout all the states be given special construction in order to cure economic abuses indigenous to Hawaii? Congress has almost autocratic power over a territory. The commercial status and labor problems of Hawaii might well be settled by specific statute.[26] But the same regulation of agriculture in the states on the mainland would be unconstitutional. In each of the two opinions of this case,[27] the trial court reviewed the whole economic structure of the Territory of Hawaii, the factor system of marketing native products, the vestiges of feudal incidents, the peculiar land system and the dependency of the islands upon the mainland. To crown all, the theory of appellees is that Congress, in passing the Fair Labor Standards Act, did not have in contemplation such an agricultural giant[28] as this

26. The thesis that the peculiar problems of a territory should not be permitted to affect construction of an act designed to protect farmers in the states is well illustrated by the progress of affairs in Puerto Rico, where the situation is even more bizarre than that in Hawaii.

Congress has approached the problem of labor in possessions pragmatically by means of extended investigations and reports. As a result of a realistic awareness of the ideochromatic characteristics of each dependency, the Sugar Act of 1937, Act, September 1, 1937, c. 898, 50 Stat. 903 ff., now 7 U.S.C.A. § 1100 et seq., was enacted, which differentiated explicitly between sugar produced on the mainland and that produced in the dependencies, territories and protectorates, and that produced in the latter between the separate areas. The Court of Appeals for the First Circuit necessarily reconciled the provisions of the Fair Labor Standards Act with the clauses of the Sugar Act applicable to Puerto Rico, Vives v. Serralles, 145 F.2d 552. Legislatively, the requirement that there be special enactments relating to Puerto Rico has been recognized by the passage of the Act of August 8, 1947, c. 519, Title II, § 202, 61 Stat. 924, as amended September 1, 1951, c. 379, § 1, 65 Stat. 318, 7 U.S.C.A. § 1112. The enactment by Congress of legislation amendatory of the Fair Labor Standards Act, relating particularly to Puerto Rico and the Virgin Islands, Act of October 26, 1949, c. 736, § 8, 63 Stat. 915, 29 U.S.C.A. § 208, indicates conformity to the strict letter of the former statute might unhinge the economy of these islands.

When the Act was new, the Wage and Hour Division interpreted the harvesting of the raw sugar from cane as "preparation for market" if done by a farmer. Subsequently, because of a series of decisions relating exclusively to Puerto Rico, the Administrator said the Wage and Hour Division had made a mistake in this interpretation, and that harvesting resulting in molasses and raw sugar was not excluded by the Act. This opinion was advanced with no consideration of the special conditions and legislation relating to the territory and with the intent that the construction be applied to the statute within the several states to which the special provisions of the enactments did not apply.

As noted previously, 178 F.2d 603, 611, the Puerto Rican cases are generally distinguishable in that they are not related to activities performed by a farmer or on a farm, but are either cooperative enterprises or are done by some outside agency. On the other hand, certain judicial interpretations, if viewed as interpretations of the general act binding on farmers on the mainland, are excrescences as foreign as gargoyles on a classic temple. McComb v. Puerto Rico Tobacco Marketing Co-op Ass'n, D.C., 80 F. Supp. 953, affirmed 1 Cir., 181 F.2d 697; McComb v. Del Valle, D.C., 80 F.Supp. 945; McComb v. Casa Baldrich, Inc., 80 F.Supp. 869; McComb v. Super-A Fertilizer Works, 1 Cir., 165 F.2d 824.

27. Found at 77 F.Supp. 480 and 97 F. Supp. 198.

28. The Supreme Court expressly recognizes that largeness is not the test. In Ad-

farming corporation in a sea island of the Pacific, and therefore the Court refused to exclude its workers employed in agriculture. This premise is obviously based upon the idea that the language of the Act clearly excludes employees of such a corporation, but, if Congress had contemplated Waialua, the law would have placed such workers under the wages and hours provisions. But, disregarding all logical conclusions from its premise, the trial court applied the drastic overtime provisions in all their rigor to the peculiar corporation which Congress had not considered.

If we were drafting a specific law to deal with labor conditions of Hawaii, emotional sympathy for some of the attitudes of the trial court might be given effect. But we are construing a general statute binding in all the states as well as this territory.

■ Everyone who remembers the history of this legislation knows that the mainland farmers were alert when these bills were in Congress. The Congressional Record indicates how changes in the language were required by them and that the legislators debated and explained the effect of each provision.[29] The statute which was written seems plainly to protect all possible phases of agricultural pursuits from regulation.[30] But the drive of a motivated bureau, which apparently considers the interests of labor utterly inimical to any protection of the farmer, has distorted the language used by some of the courts.

Do some opinions mean that the plain expressions of Congress in the statute excluding those employed in agricultural pursuits are to be overridden by some higher policy? The expressions of Congress were dictated not only by the pressure of the farmers, but by the realization that the federal constitution left local concerns such as agriculture wholly in the governance of the several states.

One of these perversions which might be allowable in a statute applicable to a territory alone is the attempt to make the farmer prove affirmatively that the particular activity falls within the statutory exclusion. The use of the word "exemption" in a heading of the enactment has been seized upon by the bureau and followed by the language of some of the courts.[31]

dison v. Holly Hill Fruit Products, Inc., 322 U.S. 607, 614–615, 64 S.Ct. 1215, 1220, 88 L.Ed. 1488, the Court adopted with approval and applied in the solution of a like problem an expression uttered in a debate in the Senate. "Senator Schwellenbach frankly stated that the largest apple packing plant in the world would be exempt if the 'work done in that plant is as described in the amendment'." The Court summarized its position as follows: "Where Congress wanted to make the exemption depend on size, as it did in two or three instances not here relevant, it did so by appropriate language. Congress referred to quantity when it desired to legislate on the basis of quantity."

29. See 81 Congressional Record 7648 et seq., 83 Congressional Record 7393, 9162–9163, 9253 et seq., H.R. No. 1452, 75th Congress, 1st Session, pp. 4–5, 11; H.R. No. 2182, 75th Congress, 3rd Session, p. 2.

30. The agricultural exclusion "is drawn in far reaching language which shows the intent of Congress to make the term 'ag-riculture' cover much more than what might be called ordinary farming activity and that is what now controls." Damutz v. William Pinchbeck, Inc., 2 Cir., 158 F.2d 882, 883, 170 A.L.R. 1246.

31. This Court, in the former opinion, 178 F.2d 603, 609, indicated that the workers in agriculture were completely excluded from the provisions of this Act. The language of the statute makes it abundantly clear that, since agriculture is a local enterprise and cannot without distortion be called commerce or preparation of goods for commerce, the manifest intention was to exclude workers on farms and those employed in agriculture from the sweep of the Act. The use of the words "exempt" and "exemptions" in the regulations and by the courts is justified by the text. But the words of the statute, "shall not apply with respect to", indicate a policy of exclusion of such employee no matter what the business of the master. With regard to agriculture, this policy of exclusion was as powerful as the policy which dictated the general provisions controlling employees in industrial pursuits. There is no

But agriculture is not commerce, interstate or foreign, nor does agriculture affect such commerce in a constitutional sense.[32] Most agricultural products eventually get into interstate transportation. But growing and harvesting of such products is not preparation of goods for commerce. The statute sets this out in immutable terms by expressly stating that preparation of goods for market by a farmer or on a farm is excluded.

 So we must go further and direct the proceeding be dismissed for abuse of discretion in entertaining a petion for declaratory judgment here and attempting to settle a question of jurisdictional and constitutional construction therein.[33]

It is true the statute was not passed with the peculiar economic situation of Hawaii in mind. Probably no specific contemplation of an organization such as Waialua was in the foreground. But no one can deny that the positive clauses of the Act were to assure the farmer in the several states of the continuance of his untrammeled way of life. It was the intention that no bureau should dictate the hours of his work[34]—traditionally from sun to sun—in the vitally essential task of feeding this nation and foreign peoples to whom aid has been extended in the form of foodstuffs. It has been a platitude of American politics that the farmer is required to pay higher prices for those things which he buys than he can obtain for the products which he raises and sells. It was in the effort to prevent the specialization of labor employed in agriculture, where every man must be able to do all of the multitudinous tasks, that these sections were adopted. It was to the end that the farmer could use in the operations on the farms unskilled and migrant labor, so that his economic burden might in one respect be lessened. These provisions of the statute were included to prevent placing innumerable restrictions and crushing burdens by bureaucratic supervision upon the American farms of the mainland.

There has been an attempt to use the Farmers Reservoir case as a precedent here.[35] The gist of the decision there was that release of water from a headgate by the field men of the reservoir company was not farming (as actual application of the water to a growing crop would have been); it was not an act done by a farmer in connection with farming and it was not done on a farm. The decision on these specific grounds must be followed. Besides, there is no reason to question its logical validity on the basis above set out. It is true that the majority unfortunately accepted the acquiescence of the parties as establishing the constitutional and jurisdictional factor that the employees of a local irrigation company were engaged in a "proc-

ground to invoke the theory of technical, narrow construction of the Act to cover this basic food supplying industry. Walling v. California Conserving Co., D.C., 74 F.Supp. 182, affirmed McComb v. Hunt Foods, 9 Cir., 167 F.2d 905, certiorari denied 335 U.S. 845, 69 S.Ct. 69, 93 L. Ed. 395.

32. Federal regulation of agriculture invades the reserved rights of the states. United States v. Butler, 297 U.S. 1, 68, 56 S.Ct. 312, 80 L.Ed. 477. But cf., Wickard v. Filburn, 317 U.S. 111, 63 S. Ct. 82, 87 L.Ed. 122.

33. "This Court is without power to give advisory opinions. It will not decide constitutional issues which are hypothetical, or in advance of the necessity for deciding them, * * *." Asbury Hospital v. Cass County, 326 U.S. 207, 213, 66 S.Ct. 61, 64, 90 L.Ed. 6.

34. Speaking of the Fair Labor Standards Act and other acts, the Court of Appeals for the Fifth Circuit states: " * * * that exemption seems to have been a part of a general legislative pattern of those times which clearly indicates that the purpose of Congress in making the exemptions in each of these Acts was to relieve distressed farmers from burdens which it well knew they were not equipped to carry." National Labor Relations Board v. John W. Campbell, Inc., 5 Cir., 159 F.2d 184, 187.

35. Farmers Reservoir & Irrigation Co. v. McComb, 337 U.S. 755, 69 S.Ct. 1274, 93 L.Ed. 1672.

ess or occupation necessary for the production of goods for commerce." Thereby the longstanding principle of decision that a constitutional and jurisdictional issue will not be debated or considered unless actively raised by the parties was abandoned. Nor can we accept as an explanation that rationalization leads to quaint results.[36]

■ However that may be, in this case in a declaratory judgment proceeding in a territory, all parties and the Department of Labor acquiesce in the proposition that farming itself is production of goods for commerce. We repudiate consent of the parties as a basis for decision. Upon this fallacious theory, the trial court arrived at its findings and conclusions here accused. We hold that a farming operation such as growing the crop or harvesting is not commerce. By no dialectics can it be shown that irrigation, cultivation, plowing of the ground, pruning of the trees or any of the processes before harvest, whether performed by a farmer or on a farm, are other than purely local concerns relating to the production of a crop. Common sense forbids it. Jurisdiction to regulate farming on the ground that the products thereof may eventually go into commerce cannot be conferred by consent of the parties even in a particular case. By definition, any process essential to the growing, production or harvesting of crops is neither interstate or foreign commerce nor preparation of goods therefor, nor yet again a process or occupation necessary for the production of goods for commerce. Farming in the several states cannot be regulated as commerce even if it does constitute preparation of farm products for market. To hold otherwise would violate the express exclusionary language of the agricultural clauses of the statute and the public policy of cheap production of foodstuffs above noted.

The public welfare requires that this staute be not given a local interpretation to fit the needs of any territory, and that such special interpretations be not applied to agriculture throughout the several states.[37] The language of the exclusion interprets a constitutional guarantee. It is a charter for the mainland farmer. So far as possible, in raising food for our widespread peoples, the farmer should be exempt from higher cost of labor. He should be able to plow, cultivate, irrigate, seed and harvest his crop without paying tribute. These processes, essential to all, should not be made to cost more.[38] The farmer in California should be able to run the heads of wheat through a thresher or combined harvester and shell out the grain, clean it, test it for protein content and store it. He should be able to transport it on the farm to the thresher or to storage or market, whether by his own railroad or by trucks or by airplane. The stock raiser in Idaho should be able to use all forms of transportation carrying calves or other stock to spring pasture or feeding grounds. The stock rancher should be able to use his vaqueros to repair barns, fences, corrals and even bunkhouses, where his employees sleep, without becoming a master carpenter. The

36. "Both in the employments which the Fair Labor Standards Act covers and in the exemptions which it makes, Congress has cast upon the courts the duty of making distinctions that often are bound to be so nice as to appear arbitrary in relation to each other." 337 U.S. at page 770, 69 S.Ct. at page 1282, concurring opinion.

37. This warning was expressed in our former opinion, 178 F.2d 603, 613: "The danger is that, by agreeing as to this course of conduct, a precedent might be established for the settlement of prob-

lems on the mainland which does not have the peculiar problems of Hawaii."

38. "It does not take a long memory to recall that in the midst of the depression of 1935, and for a time before and since, the farmer was the object of the deepest solicitude by Congress. It furnished abundant evidence that it believed that no class of citizens of the country was in greater need of Congressional aid than the farmer." National Labor Relations Board v. John W. Campbell, Inc., 5 Cir., 159 F.2d 184, 186.

raiser of peas should be able to make repairs and changes in his tractors, viners and mowers by his own employees without becoming a master mechanic. He should be able to transport the fresh peas many leagues from his land to the canner for essential immediate processing by his trucks driven by farm hands without becoming a trucker.

The sheepman can have a worker employed by him run the system of gas or home-generated electricity which lights up innumerable farm buildings and feed the chickens he sells without becoming subject to the higher costs under the industrial provisions of this law. The orchardist of Washington should be able on his own land to pare and core the apples, transport the meat thereof to market, press out cider from the corings and peelings in a steam driven mill on his own land, and apply the residual pomace as dressing to his land without becoming a manufacturer.[39] The operations described in processing raw sugar from cane in Louisiana are in the same class.[40]

The authorities adverse to the maintenance of this declaratory proceeding are set out in the previous opinion.[41]

The territorial institutions of Hawaii had provided protection for these workers almost identical with that which is the subject of this proceeding.[42] It is agreed by the parties that this Act requires Waialua to pay and it does pay as much or more than the minima of wages required per hour by the federal law. Perhaps, if local conditions compel, the territorial legislature will require the same work week in farming as is exacted by the Fair Labor Standards Act, but without federal bureaucratic control, which would necessarily be renounced if statehood were attained.[43]

 Each of these employees had an adequate remedy by action at law if any thought he was aggrieved.[44] The matter could have been tried on the facts relating to his employment without the misleading background.

The cause is reversed for proceedings in accordance with this opinion.[45]

39. The suggestion that this argument permits the farmer to carry on extraneous manufacturing of such articles as automobiles on a farm is vacuous.

40. As in the case of *Miller Hatcheries, Inc., v. Boyer*, 8 Cir., 131 F.2d 283, 286, "We are dealing with a situation where there has been 'a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new'."
The Wage and Hour Division, on August 21, 1939, interpreting the Act when it was new, said:
"Section 13(a) (6) renders the wage and hour provisions of the Act *inapplicable* to employees employed in 'agriculture' * * *
"(b) The term 'preparation for market' must be treated differently with respect to various commodities. The following activities among others, *when performed by a farmer*, seem to be included within the term: * * *
"4. *Sugar—Manufacturing raw sugar, cane or maple syrup and molasses.*" Interpretative Bulletin No. 14. (Emphasis added.)

41. 178 F.2d 603, 613–614, notes 16–28.

42. During each workweek involved herein, Waialua's employees received wages in excess of the Act's requirements. They received overtime pay for hours worked in excess of 48 hours a week. Thus defendant employees are seeking a maximum of 8 hours overtime pay for any of these workweeks.

43. Perhaps for this reason Congress has never passed special provisions of this law applicable only to Hawaii, as it did for the Virgin Islands and Puerto Rico. See Note 26, supra.

44. 29 U.S.C.A. § 216(b).

45. Arguments advanced by appellees and amicus curiae which are rendered immaterial because of the Court's decision are: (a) that the processing exemption, 29 U. S.C.A. § 207(c), applies only to the "place" in which processing is carried on and only during such time as processing is actually taking place; (b) that any employee who engages in a non-exempt activity for any portion of a workweek is covered by the Act during such workweek.

On Petition for Rehearing

The opinion of the Court needs no clarification. The cause was reversed, the final orders set aside and the cause remanded with directions to dismiss Waialua's declaratory petition. The Court construes what is called the cross-complaint as a petition also for declaratory relief. This is left undismissed by this Court. If the appellees believe this to be a counterclaim at law, they may take further proceedings as suggested in the latest opinion of this Court. The parties and the Trial Court, however, should be mindful of the fact that this Court has held that the entire cause was tainted by apparent collusion between the parties in the attempt to obtain an advisory opinion upon constitutional questions. The considerations of expense in futile proceedings are, of course, the concern of the parties.

Rehearing denied.