221 F.2d 406
 Joseph T. BUDD, Jr., and Florence W. Budd, co-partners, doing business as J. T. Budd, Jr. and Company, Appellants,
v.
James P. MITCHELL, Secretary of Labor, United States Department of Labor, Appellee.
KING EDWARD TOBACCO COMPANY OF FLORIDA and May Tobacco Company, Intervenor, Appellants,
v.
James P. MITCHELL, Secretary of Labor, United States Department of Labor, Appellee.
 No. 15016.
 No. 15071.
 United States Court of Appeals, Fifth Circuit.
 April 15, 1955.
 
 Case No. 15016:
 Julius F. Parker, Caldwell, Parker, Foster & Wigginton, Tallahassee, Fla., for appellants Joseph T. Budd, Jr., and Florence W. Budd.
 Harold C. Nystrom, Acting Asst. Solicitor Dept. of Labor, Bessie Margolin, Asst. Solicitor, Washington, D. C., Stuart Rothman, Solicitor, Joseph M. Stone, U. S. Dept. of Labor, Washington, D. C., Beverley R. Worrell, Regional Atty., Birmingham, Ala., for appellee.
 Case No. 15071:
 Edw. McCarthy, Jacksonville, Fla., Richard J. Gardner, Quincy, Fla., Mc Carthy, Lane & Adams, Jacksonville, Fla., Gardner and Lines, Quincy, Fla., of counsel, for King Edward Tobacco Co. of Florida.
 Poole, Shroyer & Denbo, Milton C. Denbo and Richard O. Michael, Washington, D. C., for May Tobacco Co.
 Before HUTCHESON, Chief Judge, and RIVES and TUTTLE, Circuit Judges.
 RIVES, Circuit Judge.
 
 
 1
 The opinion of the district Court in these cases is reported at 114 F.Supp. 865. The Budd case was the action first brought by the Secretary of Labor under Section 17 of the Fair Labor Standards Act[1] to enjoin the Budds from violating the minimum wage and record keeping provisions of the Act. At the conclusion of a pre-trial conference on that case, the district court was of the opinion that the Budd company operation was in violation of the Act, but, in order to avoid putting the small farmers, whose tobacco was processed by the Budds, at an economic disadvantage to the operators who processed their own tobacco exclusively, the court insisted that before decision in the Budd case, the issues be broadened to include such large operations. Accordingly, suit was brought against the King Edward Company and the May Company intervened.
 
 
 2
 The cases involve the definition of "Agriculture" under Title 29 U.S.C.A. § 203(f),[2] the agricultural exemptions under Section 213(a), clauses 6 and 10,[3] and incidentally the exemption from the maximum hours provision under Section 207(c).[4]
 
 
 3
 All of appellant's processing operations are in connection with U. S. Type 62 Sumatra tobacco, which is a leaf tobacco grown and used entirely for cigar wrappers. This type of tobacco is grown exclusively in three counties in North Florida, and two counties in South Georgia contiguous to two of said Florida counties. Most of such tobacco is grown within an airline radius of thirty miles of Quincy, the County Seat of Gadsden County, Florida.
 
 
 4
 We quote from the opinion of the district court:
 
 
 5
 "Method of Growing, Harvesting and Marketing Type 62 Shade Leaf Tobacco
 
 
 6
 "Type 62 shade leaf tobacco requires special and painstaking cultivation, harvesting, curing and preparation for market. It grows in fields inclosed in a cheesecloth shade, which completely covers and incloses the tobacco field. The cheesecloth is supported by wires strung on posts placed at regular intervals through the fields. It is highly fertilized and intensively cultivated during the growing period. When each leaf reaches a certain stage of maturity it is promptly harvested. This harvesting process is known as `priming'. The lower leaves are picked first, perhaps not more than two or three from each stalk. This picking is repeated as the tobacco matures on up the stalk until all the marketable leaves have been removed. At each priming the tobacco is immediately taken to a tobacco barn located on the farm where it is strung on sticks and dried by means of heat. When the tobacco is almost completely dried the drying process is interrupted and it is permitted to absorb moisture and again dried. This drying process is repeated until the tobacco has reached a stage in the process of curing when it is ready for the packing house.
 
 
 7
 "It is then taken from the barns in the field, placed in appropriate containers and carried to the packing house where it is placed in piles known as `bulks' for curing. Each bulk consists of more than 3000 lbs. of tobacco. The packing houses are equipped with machinery for the appropriate humidification and curing of the tobacco. During the curing period the temperature within each bulk is closely watched from day to day and at regular intervals, when the appropriate time has arrived, the bulk is broken up, the tobacco leaves shaken out and those on the outside placed on the inside of the new bulk and those on the inside placed on the outside for further curing. This process is continued until the tobacco is ready for market when it is bailed (sic) for shipment." Durkin v. Budd, D.C., 114 F.Supp. 865, 866-867.
 
 
 8
 After such processing, this type tobacco falls into eight main classifications, and none of those classifications can be determined prior to the processing. Primarily, because it cannot be graded until it has been processed, there is no market at an earlier stage for this type tobacco. The market variation dependent upon grading is considerable, ranging from a high of approximately $2.40 per pound down to as low as $.40 per pound.
 
 
 9
 Some 300 farmers in the Quincy area grow this type of tobacco with about 80% growing and harvesting less than 25 acres per year, and a majority producing only 1½ to 10 acres per year. As has been noted, the natural heating, fermentation, and curing of this tobacco requires bulks of more than 3000 lbs. of tobacco. The small farmers do not grow the tobacco in such quantities, and hence, cannot process their own tobacco. For the year 1950, some 52 of such small farmers cultivating a total of 263 acres had their tobacco processed by the Budd Company. That company grows no tobacco of its own but processes tobacco grown by others.
 
 
 10
 During 1950, the King Edward Tobacco Company cultivated 206 acres, and the May Company 90 acres of this type tobacco, and those two companies processed their own tobacco, and did not handle the tobacco of any other person at the packing houses here involved. Those packing houses are located in the town of Quincy, which, according to the 1950 census had a population of 6,586, and the Budds' packing house is also in that town. At the height of the packing season, May employs approximately 70 employees in its packing plant, King Edward some 120 employees, and Budd approximately 108 employees. The majority of all such employees work also on the farms when not engaged in work at the packing plants. Other pertinent facts appear in the opinion of the district court.
 
 
 11
 King Edward and May claim that their employees are exempt from the provisions of the Act under Section 213(a) (6) because they are employed in agriculture. As to King Edward and May, the appellee concedes that:
 
 
 12
 "Appellants are admittedly `farmers' in their growing operations, and admittedly the mere fact that they are large growers does not affect the availability of the exemption to them insofar as they are in fact farmers.[5] But obviously appellants are also something else in addition to being growers — they are also operating separate and extensive commercial enterprises, of the same character as similar independently owned and operated packing houses."
 
 
 13
 The district court held "that upon the record in this case the farming exemption ends when the tobacco reaches the receiving platform of the packing house * * *." 114 F.Supp. 868. We cannot agree. It seems clear to us that a farmer cannot function without a market, that everything done by these farmers was essential for the marketing of their crops, and that the work of their packing house employees, in the preparation for market of the leaf grown exclusively on their farms, constitutes "practices performed by a farmer as an incident to or in conjunction with such farming operations, including preparation for market," within the meaning of Section 203(f)[6]
 
 
 14
 All of the appellants claim that their employees are exempt from the Act by virtue of Section 213(a) (10) [see footnote 3, supra], because their operations are one of those enumerated in that section and necessary for the marketing of their crops, and because the Administrator exceeded his authority in excluding from the "area of production", "any city, town or urban place of 2,500 or greater population." Appellee concedes, as it must, that this Circuit has already held that the Administrator did so exceed his authority.[7] Appellee insists, however, that after it reached the packing house, the tobacco was no longer an "agricultural or horticultural commodity", and that the processing operation was not one of those enumerated in the section. The legislative history of Section 213(a) (10) makes clear that its primary purpose was to prevent discrimination against the small farmer.[8] When it is considered that admittedly the processing was essential for the marketing of the tobacco, again it seems clear to us that the employees of all of the appellants are exempt under Section 213(a) (10). Since we are of the opinion that the employees are exempt under Section 213(a) (10), we do not feel called upon to discuss the respective fields of operation of the total exemption in that section and of the partial exemption in Section 207(c) further than to say that we agree with the Ninth Circuit that such exemptions overlap and are not alternative or mutually exclusive. Waialua Agricultural Co. v. Maneja, 9 Cir., 178 F.2d 603, 609.[9]
 
 
 15
 Appellee insists, however, that Section 213(a) (10) is inoperative until the Administrator makes a valid definition of the area of production. That much may be granted, but in a case like this, otherwise within the exemption, and which might likely fall with a valid definition of the area of production, the appellee is in no position to seek the equitable remedy of injunction until such definition has been made.[10]
 
 
 16
 The judgments are, therefore, reversed and the causes remanded with directions to enter judgments for the defendants, and for the intervenor, May Company.
 
 
 17
 Reversed and remanded with directions.
 
 
 
 Notes:
 
 
 [1]
 Act of June 25, 1938, c. 676, 52 Stat. 1060, 29 U.S.C.A. § 201 et seq., as amended by the Fair Labor Standards Amendments of 1949, c. 736, 63 Stat. 910
 
 
 [2]
 "(f) `Agriculture' includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in section 1141j(g) of Title 12), the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market."
 
 
 [3]
 "§ 213Exemptions
 "(a) The provisions of sections 206 and 207 of this title shall not apply with respect to * * * (6) any employee employed in agriculture or in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways, not owned or operated for profit, or operated on a share-crop basis, and which are used exclusively for supply and storing of water for agricultural purposes; * * * (10) any individual employed within the area of production (as defined by the Administrator), engaged in handling, packing, storing, ginning, compressing, pasteurizing, drying, preparing in their raw or natural state, or canning of agricultural or horticultural commodities for market, or in making cheese or butter or other dairy products; * * *."
 
 
 [4]
 "§ 207. Maximum hours
 * * * * *
 "(c) In the case of an employer engaged in the first processing of milk, buttermilk, whey, skimmed milk, or cream into dairy products, or in the ginning and compressing of cotton, or in the processing of cottonseed, or in the processing of sugar beets, sugar-beet molasses, sugarcane, or maple sap, into sugar (but not refined sugar) or into sirup, the provisions of subsection (a) of this title shall not apply to his employees in any place of employment where he is so engaged; and in the case of an employer engaged in the first processing of, or in canning or packing, perishable or seasonal fresh fruits or vegetables, or in the first processing, within the area of production (as defined by the Administrator), of any agricultural or horticultural commodity during seasonal operations, or in handling, slaughtering, or dressing poultry or livestock, the provisions of subsection (a) of this title, during a period or periods of not more than fourteen workweeks in the aggregate in any calendar year, shall not apply to his employees in any place of employment where he is so engaged."
 
 
 [5]
 See Addison v. Holly Hill Fruit Products Co., Inc., 322 U.S. 607, 614, 615, 64 S.Ct. 1215, 88 L.Ed. 1488; N. L. R. B. v. John W. Campbell, Inc., 5 Cir., 159 F.2d 184, 187; Waialua Agricultural Co. v. Maneja, 9 Cir., 216 F.2d 466, 474, 475
 
 
 [6]
 See Farmers Reservoir & Irrigation Co. v. McComb, 337 U.S. 755, 69 S.Ct. 1274, 93 L.Ed. 1672; Addison v. Holly Hill Fruit Products Co., Inc., 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488; N. L. R. B. v. John W. Campbell, Inc., 5 Cir., 159 F.2d 184, 187; Waialua Agricultural Co. v. Maneja, 9 Cir., 216 F.2d 466; American Sumatra Tobacco Corp. v. Tone, 127 Conn. 132, 15 A.2d 80
 
 
 [7]
 Jenkins v. Durkin, 5 Cir., 208 F.2d 941; Lovvorn v. Miller, 5 Cir., 215 F.2d 601. Cf. Tobin v. Traders Compress Co., 10 Cir., 199 F.2d 8. It seems particularly clear that the Administrator did exceed his authority as to the area of production involved in this particular case
 
 
 [8]
 "Mr. Schwellenbach * * *. If we leave the bill the way it now stands, it is going to mean that the large producer on the large ranch who can afford to maintain the equipment on his own ranch is going to have an unfair advantage over the small man who has only 5 or 10 acres, and who has to send his crop to a central warehouse, or who may join with others in a cooperative warehouse, and there have the same processes performed." 81 Cong.Rec. 7659
 "But it seems that, so long as they remain in their natural state and all of the work that is done upon them is the ordinary agricultural operation up to the point of processing, whether they are handled on the farm or by a group of men gathered together in a cooperative, or turned over to a central warehouse, they should be exempt, because of the fact that if we do not exempt them, we are giving the large producer a very distinct advantage over the small producer, and I am certain it is not the purpose of the bill and is not within the economic theory of the bill to give the large producer an advantage over the small producer." (Emphasis supplied.) 81 Cong.Rec. 7660.
 "Mr. Schwellenbach. The amendment is very strictly drawn in an effort to limit the operations defined therein purely to those of an agricultural nature * * *. In other words, in a small apple operation of 5 or 10 or 15 or 20 acres, it is not possible for the owner of the ranch to purchase and maintain on the ranch the necessary machinery which is required in the washing operation under the rules and regulations of the Department of Agriculture. It is not possible for him to provide on his ranch the necessary storage space to store the apples until such time as it is possible to take them to market. It is not possible on the small ranch to supply the space for packing the apples. Therefore, it is necessary for such a farmer either to join other farmers in a cooperative, or to send his apples to a packing house, and have these operations, which are purely agricultural operations, performed elsewhere than at the situs of the ranch or the farm.
 "The purpose of this amendment is to give protection against that situation, and to make it possible for the small fruit and vegetable producer to operate upon the same basis as the large fruit and vegetable producer." (Emphasis supplied.) 81 Cong.Rec. 7876.
 "In other words, the small producer cannot afford to have the capital investment in the warehouse, the washing machinery, all of the necessary incidentals to this operation, while the larger producer can afford them, and he is exempt from the provisions of the bill." 81 Cong.Rec. 7877.
 "The purpose of the amendment is not for the protection of the packing plant or for the protection of the owners of the packing plant. The cost is paid by the producer. These packing plants just pass the cost back to the man who produces the apples. The farmer pays the bill. The purpose of the amendment is to permit the small farmer, who cannot afford to have his own warehouse and cannot afford to have his own washing machine, to be placed upon a parity with the larger producers, who can afford to maintain their own warehouses and their own washing machines and their own equipment." (Emphasis supplied.) 81 Cong.Rec. 7877.
 See also, the dissenting opinion in Addison v. Holly Hill Co., 322 U.S. 607, at page 633, 64 S.Ct. 1215.
 
 
 [9]
 See Fleming v. Farmers Peanut Co., 5 Cir., 128 F.2d 404; cf. Puerto Rico Tobacco Marketing Coop. Ass'n v. McComb, 1 Cir., 181 F.2d 697
 
 
 [10]
 See Messenger v. Traders Compress Co., D.C.E.D.Okl., 107 F.Supp. 354, 360; Walling v. McCracken County Peach Growers Ass'n, D.C.W.D.Ky., 50 F.Supp. 900, 905, 906